**TRENK, DiPASQUALE,**
 **DELLA FERA & SODONO, P.C.**
347 Mount Pleasant Avenue
West Orange, New Jersey 07052
(973) 243-8600
Joseph J. DiPasquale
Thomas M. Walsh
*Proposed Counsel for Passaic Healthcare Service, LLC, d/b/a Allcare Medical,*
*Debtor-in-Possession*

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>PASSAIC HEALTHCARE SERVICES, LLC, d/b/a ALLCARE MEDICAL,<br><br>Debtor. | Chapter 11<br><br>Case No. 14-36129 (\_\_\_) |

**APPLICATION IN SUPPORT OF MOTION PURSUANT TO 11 U.S.C. §§ 105, 363(c)(2)(B), 363(e), 507(b), FED. R. BANKR. P. 4001(b), AND D. N.J. L.B.R. 4001-4 FOR INTERIM AND FINAL ORDERS AUTHORIZING USE OF CASH COLLATERAL**

TO:   THE HONORABLE JUDGES OF THE
      UNITED STATES BANKRUPTCY COURT

Passaic Healthcare Services, LLC, d/b/a Allcare Medical ("PHS" or the "Debtor"), by and through its proposed counsel, Trenk, DiPasquale, Della Fera & Sodono, P.C., hereby moves (the "Motion") this Court for interim and final orders authorizing the Debtor to use cash collateral pursuant to Title 11 of the United States Code (the "Bankruptcy Code") sections 105, 363(c)(2)(B), 363(e), and 507(b), Rule 4001(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-4 of the District of New Jersey's Local Bankruptcy Rules (the "Local Bankruptcy Rules"). In support of this Motion, the Debtor respectfully states as follows:

## JURISDICTION

1. This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334.

2. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M) and (O).

3. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

4. The Debtor filed its voluntary Chapter 11 petition on December 31, 2014 (the "Petition Date").

5. A history and description of the Debtor and its operations, together with the reasons for its Chapter 11 filing, are set forth in the Declaration of Winthrop Hayes, President of the Debtor, in Support of First Day Matters (the "First Day Declaration"), which is incorporated herein as if set forth in its entirety.

**Potential Secured Creditor Issues**

### 1) Midcap Funding IV, LLC ("Midcap Funding")

6. On or about October 15, 2013, the Debtor, along with Galloping Hill and Allcare Medical SNJ, entered into a Credit and Security Agreement with Midcap Financial, LLC ("Midcap Financial") (the "Midcap Agreement").

7. Under the Midcap Agreement, Midcap Financial agreed to make certain revolving loans in accordance with the terms and conditions set forth therein. More specifically, the parties agreed to a "Revolving Loan Commitment Amount" of fifteen million dollars ($15,000,000.00), along with a potential "Additional Tranche" in the amount of ten million dollars ($10,000,000.00).

8. Pursuant to Article 9 of the Midcap Agreement, the Debtor granted Midcap Financial a first priority lien on, and security interest in, the personal property set forth in Schedule 9.1.

9. On or about October 15, 2013, Midcap Financial filed a UCC Financing Statement asserting a security interest in, among other things, "all of the Debtor's assets, including without limitation, all of Debtor's right, title and interest in and to the following . . . (a) all goods, Accounts (including health-care insurance receivables), Equipment, Inventory, contract rights or rights to payment . . . ."

10. On or about October 24, 2014, Midcap Financial filed a UCC Financing Statement Amendment assigning its rights to Midcap Funding.

11. The Debtor's books and records reflect that Midcap Funding is owed approximately $6,415,303.00.

12. On December 30, 2014, the Debtor received a correspondence from Midcap Funding styled as a "Notice of Suspension of Revolving Loan Commitment," wherein Midcap Funding suspending its revolving loan commitment under the Midcap Agreement, and otherwise reserved its rights. The Debtor intends to work amicably with Midcap for the benefit of both parties.

### 2) Sequoia Healthcare Services, LLC ("Sequoia")

13. On or about November 13, 2012, the Debtor, along with Galloping Hill and Allcare Medical SNJ, entered into a Term Note and Term Loan and Security Agreement with Sequoia (collectively, the "Sequoia Loan Documents").[1]

---

[1] Also on November 13, 2012, the Debtor, Sequoia and Mr. Richard Lerner entered into a Subordination and Intercreditor Agreement.

3

14. Under the Sequoia Loan Documents, the Debtor, Galloping Hill and Allcare Medical SNJ received a loan in the amount of $7,096,020.00 (the "Sequoia Loan").

15. As collateral for the Sequoia Loan, Sequoia obtained a security interest in, among other property, accounts, contracts, assigned contracts, deposit accounts, intangibles, goods, equipment, and inventory.

16. In connection with the Sequoia Loan, on or about November 21, 2012, Sequoia filed a UCC Financing Statement asserting a security interest in "[a]ll assets of the Debtor."

17. Subsequently, on October 15, 2013, the same day that the Debtor, Galloping Hill and Allcare Medical SNJ entered into the Midcap Agreement, the Debtor, Sequoia, Galloping Hill and Allcare Medical SNJ entered into a new Note and Amended and Restated Term Loan and Security Agreement (collectively, the "Amended Sequoia Loan Documents").

18. The purpose of the Amended Sequoia Loan Documents was to enable the Debtor and its co-borrowers to obtain additional financing from Midcap Financial.

19. Under the Amended Sequoia Loan Documents, the Debtor, Galloping Hill and Allcare Medical SNJ received a loan in the amount of $6,850,730 following the application of certain credits and the conveyance of additional working capital (the "Restated Sequoia Loan").

20. As collateral for the Restated Sequoia Loan, Sequoia obtained a security interest in, among other property, accounts, contracts, assigned contracts, deposit accounts, intangibles, goods, equipment, and inventory.

21. In connection with the Restated Sequoia Loan, on or about October 17, 2013, Sequoia filed a UCC Financing Statement asserting a security interest in "all assets, personal and fixture property of every kind and nature[.]"

22. The Debtor's books and records reflect that Sequoia is owed $11,880,690.00.

### 3) McKesson Medical-Surgical Minnesota Supply, Inc. ("McKesson")

23. On or about August 15, 2011, the Debtor and McKesson entered into a Line of Credit Agreement whereby McKesson agreed to a one million dollar ($1,000,000.00) commitment (the "McKesson Agreement").

24. Also on August 15, 2011, the Debtor and McKesson entered into a Security Agreement that granted McKesson a security interest in "[a]ll inventory ordinarily held for rent . . . and other rental equipment, wherever located, together with all attachments, replacements, substitutions, additions and accessions . . . ; and (ii) all proceeds of all of the foregoing[.]"

25. On or about September 6, 2011, McKesson filed a UCC Financing Statement asserting a security interest in the Debtor's inventory. On October 31, 2011, McKesson filed a UCC Financing Statement Amendment restating its security interest in the Debtor's inventory. On October 17, 2013, McKesson filed another UCC Financing Statement Amendment further restating its security interest in the Debtor's inventory.

26. The Debtor's books and records reflect that McKesson is owed $8,762,078.46.

### 4) Essex Capital Corporation ("Essex Capital")

27. Since in or about June 2011, the Debtor has entered into commercial lease agreements with Essex Capital for the lease of equipment needed for the Debtor's day-to-day operations. The Debtor has entered into thirteen (13) such agreements.

28. Effective January 1, 2015, ten (10) of these commercial lease agreements remain active (collectively, the "Essex Capital Leases"). Essex Capital has filed various UCC Financing Statements in connection with the equipment covered by the Essex Capital Leases.

29. The Debtor's books and records reflect that Essex Capital is owed approximately $2,640,376.00.

30. On December 30, 2014, the Debtor's proposed counsel received a correspondence from Essex Capital demanding payment in the amount of $7,059,304.50. However, this demand amount included not only the balance owed, but all future lease payments.

### 5) Other UCC-Holders

31. The following parties are also secured creditors of the Debtor and, upon information and belief, maintain active UCC Financing Statements in connection with alleged security interests in property of the Debtor:[2]

    a. LCA Bank Corporation ("LCA"): filed UCC Financing Statement on or about March 27, 2014, asserting a security interest in certain equipment (and proceeds thereof) as set forth in a related Equipment Finance and Security Agreement No. 131822-001. The Debtor's records reflect that LCA is owed $21,323.96. LCA submitted a correspondence demanding $67,901.59, however this amount included an acceleration of future lease payments.

    b. NMHG Financial Services, Inc. ("NMHG"): filed UCC Financing Statements on or about March 15, 2012, asserting security interests in "[a]ll of the equipment now or hereafter leased by Lessor to Lessee; and all accessions, additions, replacements, and substitutions thereto and therefore; and all proceeds including insurance proceeds thereof." The Debtor's records reflect that NMHG is owed $830.76.

---

[2] In addition, the following parties maintain active UCC Financing Statements in connection with alleged security interests in property of the Debtor, but do not have any claims against the Debtor; stated otherwise, the Debtor maintains a zero balance with these parties: (i) Capital One, N.A., which filed a UCC Financing Statement on or about October 20, 2011; (ii) Key Equipment Finance, Inc, (upon information and belief, d/b/a Respironics), which filed a UCC Financing Statement on or about October 4, 2011; and (iii) VGM Financial Services, a division of TCF Equipment Finance, Inc., which maintains active UCC Financing Statements in New York (Filing No. 201201245092920, filed January 24, 2012) and New Jersey (Filing No. 50442472, filed February 7, 2013).

c. Marlin Business Bank (upon information and belief, d/b/a Constructure Technologies, LLC a/k/a Marlin Leasing) ("Marlin"): filed UCC Financing Statement in or about 2013 (day/date illegible – filing number 201312260717209) asserting a security interest in certain goods (and proceeds thereof) as set forth in accompanying schedule. The Debtor's records reflect that Marlin is owed $32,341.49.

d. Medela, Inc. ("Medela"): filed a UCC Financing Statement on or about August 15, 2013, asserting a security interest in certain leased equipment as specifically set forth therein. The Debtor's records reflect that Medela is owed $20,564.00. Medela submitted a correspondence demanding $196,257.54, however this amount represented the purchase price of equipment being rented by the Debtor.

e. Philips Medical Capital, LLC ("Philips"): maintains multiple, active UCC Financing Statements: (a) New York Filing No. 201304125397056 (filed April 12, 2013): asserting security interest in connection with equipment leased or financed by Contract No. 101-10013364 and Lease No. 101-10013364; (b) New York Filing No. 201304125397068 (filed April 12, 2013): asserting security interest in connection with equipment leased or financed by Contract No. 101-10013383 and Lease No. 101-10013383; (c) New York Filing No. 2013092060030037 (filed September 20, 2013): asserting security interest in connection with equipment leased or financed by Contract No. 101-10026359    Lease No. 101-10026359; (d) New York Filing No. 201309206003049 (filed September 20, 2013): asserting security interest in connection with equipment leased or financed by Contract No. 101-10026312 and Lease No. 101-10026312; (e) New York Filing No. 201309206003051 (filed September 20, 2013): asserting security interest in connection with equipment leased or financed by Contract

No. 101-10026363 and Lease No. 101-10026363; (f) New York Filing No. 201401065012827 (filed January 6, 2014): asserting security interest in connection with equipment leased or financed by Contract No. 101-10036075 and Lease No. 101-10026363; (g) New York Filing No. 201401065012877 (filed January 6, 2014): asserting security interest in connection with equipment leased or financed by Contract No. 101-10036147 and Lease No. 101-10036147; (h) New York Filing No. 201401065012889 (filed January 6, 2014): asserting security interest in connection with equipment leased or financed by Contract No. 101-10036130 and Lease No. 101-10036130; (i) New Jersey Filing No. 50773022 (filed March 17, 2014): asserting security interest in connection with equipment leased or financed by Contract No. 101-10041609; (j) New Jersey Filing No. 50773031 (filed March 17, 2014): asserting security interest in connection with equipment leased or financed by Contract No. 101-10041609; (k) New York Filing No. 201403215283559 (filed March 21, 2014): asserting security interest in connection with equipment leased or financed by Contract No. 101-10041585 and Lease No. 101-10041585; and (l) New York Filing No. 201408205889537 (filed August 20, 2014): asserting security interest in connection with equipment and other personal property leased or financed by Agreement No. L203415-000 dated August 12, 2014. The Debtor's records reflect that Philips is owed $676,502.07.

## RELIEF REQUESTED AND REASONS THEREFOR

32.    By this Motion, the Debtor seeks the preliminary and final use of cash collateral to preserve its assets so as to maintain and maximize its value for the benefit of all parties-in-interest, and of course to also continue serving its clients/customers, many of whom rely upon the Debtor for their health and day-to-day functioning needs.

33. Pursuant to Bankruptcy Code section 363(a), cash collateral is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents . . . and the proceeds thereof." 11 U.S.C. § 363(a).

34. By operation of Bankruptcy Code section 363(c)(2) and Bankruptcy Rule 4001(b), a debtor may not use cash collateral unless the entity that has an interest in such cash collateral consents, or until the Court authorizes the use of cash collateral after notice and a hearing and upon a finding that the interest of the secured party is adequately protected. Also, section 363(c)(2) permits this Court to allow a debtor to use cash collateral so long as the debtor provides its secured creditors with adequate protection.

35. Although "adequate protection" is not defined in the Bankruptcy Code, courts generally describe it as "a balancing of the debtor's and a creditor's respective harm," see In re Carson, 34 B.R. 502, 505 (Bankr. D. Kan. 1983) (citation omitted), and the legislative history of Bankruptcy Code section 361 reflects congressional intent to give courts flexibility to fashion adequate protection in light of the facts of each case and general equitable principles. In re 5-Leaf Cover Corp., 6 B.R. 463, 466 (Bankr. S.D. W. Va. 1980).

36. In addition, Bankruptcy Code section 361 sets forth three (3) non-exclusive[3] methods of how an interest in property may be adequately protected, stating as follows:

> When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—
>
> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title

---

[3] Courts have held that the adequate protection mechanisms enumerated by Bankruptcy Code section 361 are not exhaustive. See In re Miller, 734 F.2d 1396 (9th Cir. 1984); In re Family Place Partnership, 95 B.R. 166 (Bankr. E.D. Cal. 1989).

9

>    results in a decrease in the value of such entity's interest in such property;
>
>    (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or
>
>    (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

37.    The "interest" of a secured creditor which is entitled to be protected is the value of the secured creditor's allowed secured claim; that is, the amount of the secured creditor's claim up to the value of the collateral upon which the secured creditor has a lien as of the relevant valuation date. In re Shriver, 33 B.R. 176, 181 (Bankr. N.D. Ohio 1983); In re South Village, Inc., 25 B.R. 987, 994 (Bankr. D. Utah 1982). The alleged secured creditor is only entitled to assurance that the value of its lien will not decrease as a result of the automatic stay and, if it does, that it will receive something as compensation for the decrease. In re Ramco Well Service, Inc., 32 B.R. 525, 531 (Bankr. W.D. Okla. 1983). Therefore, where the value of the collateral is not declining, a debtor need not do anything for the secured creditor as it is adequately protected. Id.; accord, In re Price, 40 B.R. 578, 580 (Bankr. N.C. Tex. 1984).

38.    Furthermore, courts have held that the existence of an equity cushion can also provide adequate protection. In re Gallegos Research Group, Corp., 193 B.R. 577, 584 (Bankr. D. Col. 1995) (oversecured creditors may not be entitled to cash payments or post-petition liens because they are adequately protected through the existence of a value cushion). Personal

guaranties are to be taken into account when calculating the value of a secured creditor's equity cushion. See, e.g., In re Diaconx Corp., 69 B.R. 333, 340 (Bankr. E.D. Pa. 1987).

39. In the present matter, the Debtor's secured creditors will be adequately protected during the pendency of the Debtor's bankruptcy case. With regard to the Debtor's assets: (A) as of November 30, 2014, the Debtor's fixed assets were valued at almost $5 million (specifically, and taking account of accumulated depreciation, $4,898,960); (B) the Debtor has inventory listed at a value of approximately $1.8 million; and (C) the Debtor holds accounts receivable totaling approximately $9.7 million.

40. On a going-forward basis the Debtor will also be able to adequately protect its secured creditors through future revenues. Over the next three (3) years the Debtor projects revenues of approximately $12 million.

41. In addition, as discussed below, the Debtor will be making periodic payments to its primary secured creditor, Midcap Funding.

42. Furthermore, secured creditors will remain secured by their existing security interests, including equipment, inventory, and other personalty.

43. Assuming arguendo that secured creditors raise arguments that the Debtor should not be permitted to use its "cash collateral," the Debtor will only use such alleged cash collateral in the ordinary course of its business and in accordance with the budget annexed as **Exhibit A** (the "Budget") to the First-Day Declaration, which projects revenues and expenses from January 2015 through April 2015.

44. The Budget reflects only those expenditures needed to (A) maintain the Debtor's operations; (B) protect the Debtor's clients/customers; and (C) protect creditor interests.

45. Furthermore, the Debtor will be making periodic payments to Midcap Funding as additional adequate protection. During the pertinent period the Debtor proposes to pay approximately $634,681.00 in adequate protection payments to Midcap Funding.

46. A denial of the use of alleged cash collateral to fund the Debtor's day-to-day operations will severely harm the Debtor at a critical time, effectively hindering its ability to reorganize. Essentially, without the authority to use alleged cash collateral, the Debtor cannot continue to operate; that will cause a loss of going concern value, and preclude the ability to reorganize, thereby preventing creditors from realizing upon reorganization value.

47. The Debtor has the ability to reorganize within a reasonable period of time and to make distributions for the benefit of all creditors.

48. The Debtor is prepared to discuss with all of its creditors the development of both a financial and operational restructuring plan. The authority to use alleged cash collateral will enable the Debtor to engage in those discussions and accomplish its reorganization, while operating in the ordinary course.

## TIMING AND NOTICES

49. The Debtor respectfully seeks a two-part hearing process.

50. First, pursuant to Bankruptcy Rule 4001(b)(2), the Debtor seeks a preliminary hearing on the use of Cash Collateral in accordance with the Budget on less than fifteen (15) days' notice.

51. Second, the Debtor seeks a final hearing on at least fifteen (15) days' notice. At a minimum, the Debtor proposes to give notice pursuant to Bankruptcy Rule 4001(b)(1) and (3) to the Office of the United States Trustee, all secured creditors, the Debtor's twenty (20) largest

unsecured creditors, any other parties claiming an interest in the Cash Collateral, and any party who has requested notice.

## NO PRIOR REQUEST

52.　No prior application for the same or similar relief has been made to this or any other Court.

## REQUEST FOR WAIVER OF BRIEF

53.　As no novel issue of law is raised and the relevant authorities relied upon by the Debtor are set forth herein, the Debtor respectfully requests that the requirement of Local Bankruptcy Rule 9013-2, concerning the filing of a brief, be waived.

**WHEREFORE**, the Debtor respectfully requests that the Court (i) enter an interim order, substantially in the form submitted herewith, authorizing the use of alleged cash collateral on an interim basis; (ii) enter a final order, substantially in the form submitted herewith, authorizing the use of alleged cash collateral on a final basis; and (iii) grant such other and further relief as the Court deems just and proper.

> Respectfully submitted,
>
> **TRENK, DIPASQUALE,
> DELLA FERA & SODONO, P.C.**
> *Proposed Counsel for Passaic Healthcare Service, LLC, d/b/a Allcare Medical, Chapter 11 Debtor and Debtor-in-Possession*
>
> By:　/s/ *Thomas M. Walsh*
> 　　　Thomas M. Walsh

Dated: December 31, 2014

4843-5483-7025, v. 1