**TRENK, DiPASQUALE,**
  **DELLA FERA & SODONO, P.C.**
347 Mount Pleasant Avenue
West Orange, New Jersey 07052
(973) 243-8600
Joseph J. DiPasquale
Thomas M. Walsh
*Proposed Counsel for Passaic Healthcare Service, LLC, d/b/a Allcare Medical,*
*Debtor-in-Possession*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| PASSAIC HEALTHCARE SERVICES, LLC, d/b/a ALLCARE MEDICAL, | Case No. 14-36129 (___) |
| Debtor. | |

### DECLARATION OF WINTHROP HAYES, PRESIDENT OF PASSAIC HEALTHCARE SERVICES, LLC, D/B/A ALLCARE MEDICAL, IN SUPPORT OF FIRST DAY MATTERS

Winthrop Hayes, pursuant to 28 U.S.C. § 1746, hereby certifies as follows:

1.      I am the President of Chapter 11 debtor-in-possession Passaic Healthcare Services, LLC, d/b/a Allcare Medical ("PHS" or the "Debtor"), and as such am familiar with the facts set forth below.

2.      I submit this Certification in support of the following first day matters:

      i.      Motion for Expedited Consideration of First Day Matters;

      ii.      Motion for an Order (A) Authorizing Debtor to Continue Using Existing Cash Management System, Bank Accounts, and Business Forms; and (B) Granting a Waiver of the Deposit Guidelines Set Forth in Section 345 of the Bankruptcy Code;

      iii.      Motion for an Order Pursuant to 11 U.S.C. §§ 105(a), 507(a)(4) and 507(a)(5): (I) Authorizing Debtor to Pay Pre-Petition Wages, Salaries, and Payroll-Related Taxes for Pre-Petition Periods;

(B) Directing All Banks to Honor Pre-Petition Checks for Payment of Pre-Petition Employee Obligations; (C) Authorizing the Debtor to Honor Workers' Compensation and Certain Employee Benefit Obligations;

iv. Debtor's Motion for a Bridge Order and a Final Order (I) Prohibiting Utility Companies from Discontinuing, Altering or Refusing Service, (II) Deeming Utility Companies to Have Adequate Assurance of Payment, and (III) Establishing Procedures for Resolving Requests for Additional Assurance Pursuant to 11 U.S.C. §§ 105(a) and 366; and

v. Application in Support of Motion Pursuant To 11 U.S.C. §§ 105, 363(c)(2)(B), 363(e), 507(b), Fed. R. Bankr. P. 4001(B), and D. N.J. L.B.R. 4001-4 For Interim and Final Orders Authorizing Use of Cash Collateral.

## I. Debtor's Business, Structure, and Operations

3. The Debtor is a New Jersey limited liability company organized pursuant to the New Jersey Limited Liability Company Act on March 17, 2009. The Debtor is currently governed by the Second Amended and Restated Operating Agreement of Passaic Healthcare Services, LLC.

4. The Debtor's registered agent is The Corporation Trust Company. The Debtor's registered office is located at 820 Bear Tavern Road, West Trenton, New Jersey 08628.

5. The Debtor's principal place of business is 125 Newton Road, Suite 300, Plainview, New York 11803. The Debtor has seven (7) locations in New Jersey, New York and Pennsylvania.

6. The Debtor is a full service durable medical equipment ("DME") company specializing in clinical respiratory, wound care and support services. The Debtor employs a devoted team of approximately 200 individuals. From the initial call to setup and instruction of the equipment, the Debtor's assessment and reassessment programs are geared towards a higher level of patient compliance.

7.    Generally, the Debtor has three (3) lines of business:

i.    the supply of DME, including respiratory equipment and accessories, wheelchairs and accessories, mobility products, and daily living aids;[1]

ii.    the provision of DME, respiratory equipment and supplies to patients receiving care from a hospice agency; and

iii.    sale of disposable/consumable medical supplies (*e..g*, diapers, nutritional formula, *etc.*).

8.    The Debtor's revenues are generated by the foregoing lines of business, in part through the collection of accounts receivable and other cash collections.

9.    The Debtor's operations and affairs are overseen by Winthrop Hayes, President.

10.    The Debtor was formerly known as C&C Homecare, Inc. ("C&C"). In December 2010, the Debtor acquired substantially all of the assets of C&C and Extended Care Concepts, LLC through a bankruptcy sale under Bankruptcy Code section 363. Prior to the acquisition of these assets, the Debtor had no business operations. In order to maintain continuity with the patients and accounts that the Debtor serviced subsequent to the asset purchase, the Debtor did business as C&C Homecare.

11.    In addition, the Debtor holds one hundred percent (100%) of the equity in Galloping Hill Surgical, LLC ("Galloping Hill")[2] and Allcare Medical SNJ, LLC ("Allcare

---

[1] Other examples include home medical equipment and supplies; hospital beds and support surfaces; wheelchairs, scooters. and walking aids; diabetic supplies and ostomy supplies; incontinence and urinary care items; wound care supplies; bathroom safety equipment; enteral nutritionals; oxygen and respiratory therapy products; rehabilitation technology; orthopedic products; and physical therapy aids.

[2] Survivor of merger between Galloping Hill Surgical Corp. and Galloping Hill.

Medical SNJ").[3]  The Debtor obtained the equity of these entities through a Membership Interest Purchase Agreement entered on November 13, 2012, by and among the Debtor, Galloping Hill, Allcare Medical SNJ, Richard Lerner and Robert O'Connor.  Galloping Hill Surgical and Allcare Medical SNJ both did business as Allcare Medical.  Upon consummating its acquisition of these entities, the Debtor began using "Allcare Medical" as the trade name for its entire business, and discontinued marketing under the name C&C Homecare.

12.    The Debtor is in full compliance with the laws, rules and regulations governing its operations.  In addition, all payroll taxes are current.

13.    The Debtor has numerous other qualifications, including the following:

    i.    recognized by Medicare to meet the home medical equipment needs of seniors, and meets all current Medicare supplier standards;

    ii.    staff has an average of 30 years of experience in healthcare, care giving and meeting the needs of those who need home medical equipment and services, and includes those with many important professional designations, including Respiratory Therapists on staff;

    iii.    company standards require each of our associates to receive thirty (30) hours of continuing education annually;

    iv.    accredited by The Joint Commission, a third-party accrediting agency approved by Medicare to review and confirm that the Debtor operates within Medicare's supplier guidelines; and

    v.    member of the Sayreville Chamber of Commerce, the VGM Group national network of homecare providers (an educational group for DME providers), the Jersey

---

[3] Survivor of merger between Allcare Medical SNJ Corp. and Allcare Medical SNJ.

4

Association of Medical Equipment Suppliers (JAMES), and the North American Association of Medical Equipment Suppliers (NAIMES).

14.     The Debtor maintains a full a spectrum of all necessary and appropriate insurance policies including commercial general liability, professional liability, commercial automobile liability, commercial property insurance, and workers compensation insurance.

## II.    Reasons for Bankruptcy Filing

15.     As summarized below, a variety of factors lead to the Debtor's bankruptcy filing. It should be noted that before seeking relief under Chapter 11, the Debtor exerted considerable time, effort and due diligence to, among other things, improve its cash collection, streamline operations, market its business, and work out its debt obligations. Unfortunately, the Debtor was unsuccessful, thus resulting in the need for this Chapter 11 filing.

### A.  Net Revenue/Cash Collection Issues

16.     In the years preceding the Debtor's bankruptcy filing, the Debtor's aforementioned lines of business, while sound and well-run, did not generate sufficient revenue to offset the costs incurred in connection with the Debtor's rapid expansion, which was largely necessitated by Medicare price reductions (see below). The Debtor's expenses outpaced revenues, resulting in unanticipated revenue shortfalls and budgetary constraints. In the first quarter of 2014, for instance, the Debtor experienced a net loss of $1,518,428.

17.     A related issue facing the Debtor was the need to improve its order-to-cash processing, which is necessary to increase the amount of cash collected by the Debtor at a lower operating cost. In its efforts to improve its order-to-cash processing, the Debtor retained GenPact, Ltd. ("GenPact"), a multi-national process consulting company with a dedicated healthcare revenue cycle practice. GenPact staffed a three person team at the Debtor's locations

for six weeks to identify opportunities and build a project plan to improve the Debtor's order-to-cash process.

18.    Although GenPact's report identified many opportunities to increase cash collections while reducing costs, it was evident that the time and capital investment required to monetize these improvements would be undermined by the Debtor's near-term liquidity issues.

### B.   Medicare Price Reductions

19.    Medicare introduced a program specific to reimbursement for respiratory and DME products which relied upon competitive bidding.  Under this program, Medicare auctioned contracts to provide Medicare beneficiaries with DME and respiratory equipment.  The Debtor participated in this auction and placed 72 bids to provide various types of DME and respiratory equipment across the metropolitan region.  The Debtor was awarded 63 of the 72 contracts for which it bid.

20.    Unfortunately, as a result of the auction process, the price paid by Medicare for the products furnished under these contracts represented an average decrease of forty-five percent (45%) to the price paid to the Debtor prior to the implementation of the competitive bidding program.  The competitive bidding process used the median price of all winning bids in a given product category and region to establish the price going forward, meaning that in many cases the Debtor received a contracted price less than what the Debtor had bid.

21.    Shortly following the implementation of this new pricing in July 2013, many commercial insurance companies unilaterally reduced their reimbursements for DME and respiratory equipment to match the decline in Medicare pricing.  The Debtor was unable to reduce its purchasing and other costs to accommodate the dramatically reduced pricing from Medicare and commercial insurance payors.

### C. Landauer's Breach of Agreement

22.    Upon learning in January 2013 that it was awarded the Medicare contracts at dramatically reduced pricing, the Debtor explored many strategies to increase its volume and efficiency in order to address the price reductions under the new Medicare contracts.

23.    In March 2013, the Debtor executed a binding letter-of-intent to acquire Landauer Metropolitan, Inc. ("Landauer"), the largest regional DME and respiratory equipment provider in the Northeast.  The Debtor believed that by acquiring Landauer, and integrating the Debtor's operations into Landauer, the Debtor would achieve the scale and operating efficiencies necessary to cope with the dramatic price reductions.

24.    Unfortunately, after executing the binding letter-of-intent and jointly announcing the transaction publicly, Landauer's ownership terminated the sale and signed merger agreements with two other DME and respiratory providers.  The Debtor filed breached of contract claims against Landauer.

### D. Unsustainable Expansion

25.    The timing of Landauer's termination of the agreement in April 2013 left the Debtor with little time to prepare an alternative strategy to address the pricing cuts that would be made effective in July 2013.  In the remaining months prior to the implementation of the Medicare price reductions, the Debtor developed an internal plan to increase volume.  The Debtor hired a large sales staff and substantially expanded its operations teams to address the expected increase in volume.  Due to the capital-intensive nature of the DME business, particularly for growing DME companies, the Debtor worked with new and existing secured lenders to establish a capitalization plan for the business.  The capitalization plan was intended to

address an anticipated operating cash deficit the Debtor budgeted to experience through the first half of 2014 due to the expected growth in the business.

26.    The actual operating cash deficits were significantly greater and persisted longer than the Debtor budgeted for two primary reasons: (i) the Debtor lacked adequate systems and personnel to properly bill and collect from third-party insurance payors; and (ii) the new business generated by the Debtor's DME and respiratory business line substantially under-performed the Debtor's expectations.  The Debtor's difficulty in billing and collecting stemmed from the shift in products and payors that made up the Debtor's new volume.  In addition, the Debtor was in the process of consolidating from two separate billing and collections systems to one.  Managing the integration of its billing systems while simultaneously bringing on new staff and substantial volume increases overwhelmed the Debtor's resources and contributed to the Debtor's difficulties in collecting from payors.

### E.  Mounting Debt Service & Diminished Working Capital

27.    As specifically discussed elsewhere herein, the Debtor's debt obligations reached unmanageable levels in part due to the Debtor's other challenges, including the Debtor's rapid expansion.

28.    Further compounding the Debtor's dilemma was that Midcap Financial/Midcap Funding (defined below), the Debtor's senior asset-based lender, began reducing the cash available under the Debtor's line of credit in response to the Debtor's cash collection challenges. These reductions to credit line availability exacerbated the Debtor's liquidity challenges.

29.    Although the Debtor endeavored to work amicably with its secured creditors to resolve its fiscal issues, no viable solution materialized.

**F. Litigation**

30.     Complaints filed against the Debtor further contributed to the Debtor's need to file bankruptcy. Subsequent to the Debtor's filing of breach of contract claims against Landauer, which alleged violations of the standstill provisions under the binding letter of intent, Landauer filed counterclaims against the Debtor alleging breach of contract related to a non-disclosure agreement.

31.     Subsequently, Landauer filed for bankruptcy in July 2013, and the Debtor's claims against Landauer Metropolitan were stayed. However, Landauer's claims against the Debtor are continuing, and an expensive and time-consuming discovery process is scheduled to begin shortly.

32.     In addition, Wendy Bartlett, a former employee, has filed a complaint alleging she was not paid for overtime. The Debtor believes Ms. Bartlett was paid appropriately during her employment with the Debtor, but that matter will also soon enter an expensive discovery process.

**G. Inability to Sell Business**

33.     In its efforts to identify a buyer for some or all of the Debtor's business, the Debtor contacted many regional DME providers that would represent natural acquirers for the business.

34.     However, many DME providers are struggling with several of the factors that have contributed to the Debtor's own financial challenges, and therefore were unable to provide offers that would fairly value the assets of the Debtor's business.

### III.    Chapter 11 Goals

35.     Through its Chapter 11 filing, the Debtor seeks to ensure stability, along with an opportunity to reorganize and reclaim profitability, while still attempting to work with all of its creditors for the mutual benefit of all involved.

36.     Equally important, the Debtor has customers and patients that depend upon its goods, services and expertise.  For instance, the Debtor services approximately sixty (60) ventilator patients. These types of services and equipment provide vital life support.  Through filing for Chapter 11, the Debtor seeks to continue to service these individuals.

37.     The breathing spell afforded by this bankruptcy proceeding is critical in that it will allow the Debtor to effectively reorganize its business operations and affairs free from the duress and financial pressure associated with litigation and other creditor actions.

38.     Once the Debtor has been provided an opportunity to fully engage in the Chapter 11 process, it will begin to formulate a plan to regain its financial footing while also addressing creditor claims.

39.     Contemporaneously with the preparation and filing of a plan of reorganization, the Debtor will implement a number of strategic solutions to become a more viable and efficient enterprise, including:

     i.     partnering with another DME and respiratory equipment provider, QMES, LLC, to transition the majority of the Debtor's accounts that provide DME and respiratory equipment orders for patients residing in New York; this partnership will allow the Debtor to minimize its exposure to this under-performing line of business, substantially reduce overhead, and focus its efforts on other, more profitable lines of business;

ii.    streamlining segments of the Debtor's operations to reduce overhead while

limiting any negative effects on the quality of services and efficiency of operations;

iii.    continuing efforts to procure more cost-effective vendors;

iv.    improving collection billings to third-party payors;

v.    aggressively reducing accounts payable; and

vi.    potentially seeking capital.

The Debtor is confident that such measures will allow it to regain its financial footing.

## IV.    Facts Specifically Relevant to First Day Matters

### A. Potential Secured Creditor Issues

#### 1)  Midcap Funding IV, LLC ("Midcap Funding")

40.    On or about October 15, 2013, the Debtor, along with Galloping Hill and Allcare

Medical SNJ, entered into a Credit and Security Agreement (the "Midcap Agreement") with

Midcap Financial, LLC ("Midcap Financial").

41.    Under the Midcap Agreement, Midcap Financial agreed to make certain revolving

loans in accordance with the terms and conditions set forth therein.  More specifically, the parties

agreed to a "Revolving Loan Commitment Amount" of fifteen million dollars ($15,000,000.00),

along with a potential "Additional Tranche" in the amount of ten million dollars

($10,000,000.00).

42.    Pursuant to Article 9 of the Midcap Agreement, the Debtor granted Midcap

Financial a first priority lien on, and security interest in, the personal property set forth in

Schedule 9.1.

43.    On or about October 15, 2013, Midcap Financial filed a UCC Financing

Statement asserting a security interest in, among other things, "all of the Debtor's assets,

including without limitation, all of Debtor's right, title and interest in and to the following . . . (a) all goods, Accounts (including health-care insurance receivables), Equipment, Inventory, contract rights or rights to payment . . . ."

44.     On or about October 24, 2014, Midcap Financial filed a UCC Financing Statement Amendment assigning its rights to Midcap Funding.

45.     The Debtor's books and records reflect that Midcap Funding is owed approximately $6,415,303.00.

46.     On December 30, 2014, the Debtor received a correspondence from Midcap Funding styled as a "Notice of Suspension of Revolving Loan Commitment," wherein Midcap Funding suspended its revolving loan commitment under the Midcap Agreement, and otherwise reserved its rights.  The Debtor intends to work amicably with Midcap for the benefit of both parties.

### 2)  Sequoia Healthcare Services, LLC ("Sequoia")

47.     On or about November 13, 2012, the Debtor, along with Galloping Hill and Allcare Medical SNJ, entered into a Term Note and Term Loan and Security Agreement with Sequoia (collectively, the "Sequoia Loan Documents").[4]

48.     Under the Sequoia Loan Documents, the Debtor, Galloping Hill and Allcare Medical SNJ received a loan in the amount of $7,096,020.00 (the "Sequoia Loan").

49.     As collateral for the Sequoia Loan, Sequoia obtained a security interest in, among other property, accounts, contracts, assigned contracts, deposit accounts, intangibles, goods, equipment, and inventory.

---

[4] Also on November 13, 2012, the Debtor, Sequoia and Mr. Richard Lerner entered into a Subordination and Intercreditor Agreement.

50.     In connection with the Sequoia Loan, on or about November 21, 2012, Sequoia filed a UCC Financing Statement asserting a security interest in "[a]ll assets of the Debtor."

51.     Subsequently, on October 15, 2013, the same day that the Debtor, Galloping Hill and Allcare Medical SNJ entered into the Midcap Agreement, the Debtor, Sequoia, Galloping Hill and Allcare Medical SNJ entered into a new Note and Amended and Restated Term Loan and Security Agreement (collectively, the "Amended Sequoia Loan Documents").

52.     The purpose of the Amended Sequoia Loan Documents was to enable the Debtor and its co-borrowers to obtain additional financing from Midcap Financial.

53.     Under the Amended Sequoia Loan Documents, the Debtor, Galloping Hill and Allcare Medical SNJ received a loan in the amount of $6,850,730 following the application of certain credits and the conveyance of additional working capital (the "Restated Sequoia Loan").

54.     As collateral for the Restated Sequoia Loan, Sequoia obtained a security interest in, among other property, accounts, contracts, assigned contracts, deposit accounts, intangibles, goods, equipment, and inventory.

55.     In connection with the Restated Sequoia Loan, on or about October 17, 2013, Sequoia filed a UCC Financing Statement asserting a security interest in "all assets, personal and fixture property of every kind and nature[.]"

56.     The Debtor's books and records reflect that Sequoia is owed $11,880,690.00.

### 3) McKesson Medical-Surgical Minnesota Supply, Inc. ("McKesson")

57.     On or about August 15, 2011, the Debtor and McKesson entered into a Line of Credit Agreement whereby McKesson agreed to a $1,000,000.00 commitment (the "McKesson Agreement").

58.     Also on August 15, 2011, the Debtor and McKesson entered into a Security
Agreement that granted McKesson a security interest in "[a]ll inventory ordinarily held for
rent . . . and other rental equipment, wherever located, together with all attachments,
replacements, substitutions, additions and accessions . . . ; and (ii) all proceeds of all of the
foregoing[.]"

59.     On or about September 6, 2011, McKesson filed a UCC Financing Statement
asserting a security interest in the Debtor's inventory.  On October 31, 2011, McKesson filed a
UCC Financing Statement Amendment restating its security interest in the Debtor's inventory.
On October 17, 2013, McKesson filed another UCC Financing Statement Amendment further
restating its security interest in the Debtor's inventory.

60.     The Debtor's books and records reflect that McKesson is owed approximately
$8,762,078.46.

### 4)  Essex Capital Corporation ("Essex Capital")

61.     Since in or about June 2011, the Debtor has entered into commercial lease
agreements with Essex Capital for the lease of equipment needed for the Debtor's day-to-day
operations.  The Debtor has entered into thirteen (13) such agreements.

62.     Effective January 1, 2015, ten (10) of these commercial lease agreements remain
active (collectively, the "Essex Capital Leases").  Essex Capital has filed various UCC Financing
Statements in connection with the equipment covered by the Essex Capital Leases.

63.     The Debtor's books and records reflect that Essex Capital is owed approximately
$2,640,376.00.

64.    On December 30, 2014, the Debtor's proposed counsel received a correspondence from Essex Capital demanding payment in the amount of $7,059,304.50. However, this demand amount included not only the balance owed, but all future lease payments.

### 5) Other UCC-Holders

65.    The following parties are also secured creditors of the Debtor and, upon information and belief, maintain active UCC Financing Statements in connection with alleged security interests in property of the Debtor:[5]

i.    LCA Bank Corporation ("LCA"): filed UCC Financing Statement on or about March 27, 2014, asserting a security interest in certain equipment (and proceeds thereof) as set forth in a related Equipment Finance and Security Agreement No. 131822-001. The Debtor's records reflect that LCA is owed $21,323.96. LCA submitted a correspondence demanding $67,901.59, however this amount included an acceleration of future lease payments.

ii.    NMHG Financial Services, Inc. ("NMHG"): filed UCC Financing Statements on or about March 15, 2012, asserting security interests in "[a]ll of the equipment now or hereafter leased by Lessor to Lessee; and all accessions, additions, replacements, and substitutions thereto and therefore; and all proceeds including insurance proceeds thereof." The Debtor's records reflect that NMHG is owed $830.76.

---

[5] In addition, the following parties maintain active UCC Financing Statements in connection with alleged security interests in property of the Debtor, but do not have any claims against the Debtor; stated otherwise, the Debtor maintains a zero balance with these parties: (i) Capital One, N.A., which filed a UCC Financing Statement on or about October 20, 2011; (ii) Key Equipment Finance, Inc, (upon information and belief, d/b/a Respironics), which filed a UCC Financing Statement on or about October 4, 2011; and (iii) VGM Financial Services, a division of TCF Equipment Finance, Inc., which maintains active UCC Financing Statements in New York (Filing No. 201201245092920, filed January 24, 2012) and New Jersey (Filing No. 50442472, filed February 7, 2013).

iii.    Marlin Business Bank (upon information and belief, d/b/a Constructure Technologies, LLC a/k/a Marlin Leasing) ("Marlin"): filed UCC Financing Statement in or about 2013 (day/date illegible – filing number 201312260717209) asserting a security interest in certain goods (and proceeds thereof) as set forth in accompanying schedule. The Debtor's records reflect that Marlin is owed $32,341.49.

iv.    Medela, Inc. ("Medela"): filed a UCC Financing Statement on or about August 15, 2013, asserting a security interest in certain leased equipment as specifically set forth therein.  The Debtor's records reflect that Medela is owed $20,564.00.  Medela submitted a correspondence demanding $196,257.54, however this amount represented the purchase price of equipment being rented by the Debtor.

v.    Philips Medical Capital, LLC ("Philips"): maintains multiple, active UCC Financing Statements: (a) New York Filing No. 201304125397056 (filed April 12, 2013): asserting security interest in connection with equipment leased or financed by Contract No. 101-10013364 and Lease No. 101-10013364; (b) New York Filing No. 201304125397068 (filed April 12, 2013): asserting security interest in connection with equipment leased or financed by Contract No. 101-10013383 and Lease No. 101-10013383; (c) New York Filing No. 201309206003037 (filed September 20, 2013): asserting security interest in connection with equipment leased or financed by Contract No. 101-10026359    Lease No. 101-10026359; (d) New York Filing No. 201309206003049 (filed September 20, 2013): asserting security interest in connection with equipment leased or financed by Contract No. 101-10026312 and Lease No. 101-10026312; (e) New York Filing No. 201309206003051 (filed September 20, 2013): asserting security interest in connection with equipment leased or financed by Contract

16

No. 101-10026363 and Lease No. 101-10026363; (f) New York Filing No. 201401065012827 (filed January 6, 2014): asserting security interest in connection with equipment leased or financed by Contract No. 101-10036075 and Lease No. 101-10026363; (g) New York Filing No. 201401065012877 (filed January 6, 2014): asserting security interest in connection with equipment leased or financed by Contract No. 101-10036147 and Lease No. 101-10036147; (h) New York Filing No. 201401065012889 (filed January 6, 2014): asserting security interest in connection with equipment leased or financed by Contract No. 101-10036130 and Lease No. 101-10036130; (i) New Jersey Filing No. 50773022 (filed March 17, 2014): asserting security interest in connection with equipment leased or financed by Contract No. 101-10041609; (j) New Jersey Filing No. 50773031 (filed March 17, 2014): asserting security interest in connection with equipment leased or financed by Contract No. 101-10041609; (k) New York Filing No. 201403215283559 (filed March 21, 2014): asserting security interest in connection with equipment leased or financed by Contract No. 101-10041585 and Lease No. 101-10041585; and (l) New York Filing No. 201408205889537 (filed August 20, 2014): asserting security interest in connection with equipment and other personal property leased or financed by Agreement No. L203415-000 dated August 12, 2014. The Debtor's records reflect that Philips is owed $676,502.07.

### 6) Adequate Protection

66.     The Debtor's secured creditors will be adequately protected during the pendency of the Debtor's bankruptcy case. With regard to the Debtor's assets: (A) as of November 30, 2014, the Debtor's fixed assets were valued at almost $5 million (specifically, and taking account of accumulated depreciation, $4,898,960); (B) the Debtor has inventory listed at a value of

17

approximately $1.8 million; and (C) the Debtor holds accounts receivable totaling approximately $9.7 million.

67.     On a going-forward basis the Debtor will also be able to adequately protect its secured creditors through future revenues.  Over the next three (3) years the Debtor projects revenues of approximately $12 million.

68.     Furthermore, as discussed below, the Debtor will be making periodic payments to its primary secured creditor, Midcap Funding.

### 7) Cash Collateral Budget

69.     The Debtor will only use alleged cash collateral in the ordinary course of its business and in accordance with the budget annexed as **Exhibit A** (the "Budget"), which projects revenues and expenses from January 2015 through April 2015.

70.     The Budget reflects only those expenditures needed (A) maintain the Debtor's operations; (B) protect the Debtor's clients/customers; and (C) protect creditor interests.

71.     Furthermore, the Debtor will be making periodic payments to Midcap Funding as additional adequate protection.  During the pertinent period the Debtor proposes to pay approximately $634,681.00 in adequate protection payments to Midcap Funding.

### B. Debtor's Cash Management Systems, Bank Accounts, & Business Forms

72.     Currently, the Debtor has ten (10) bank accounts (collectively, the "Bank Accounts"), of which eight (8) are maintained at PNC Bank, N.A. ("PNC"), one (1) is maintained at Chase Bank, and one (1) at Sterling Bank:

| Bank | Address | Account Number | Account Type |
|------|---------|----------------|--------------|
| PNC Bank, N.A. | 500 First Avenue Pittsburgh, PA  15219 | XXXXXX2829 | Concentration Account (used to sweep funds to MidCap) |
| PNC Bank, N.A. | 500 First Avenue Pittsburgh, PA  15219 | XXXXXX2837 | Disbursement account for general operating expenses |

| PNC Bank, N.A. | 500 First Avenue Pittsburgh, PA 15219 | XXXXXX2845 | Control account for collections from Commercial payors to the NY business |
|---|---|---|---|
| PNC Bank, N.A. | 500 First Avenue Pittsburgh, PA 15219 | XXXXXX2853 | Control account for collections from Commercial payors to the NJ business |
| PNC Bank, N.A. | 500 First Avenue Pittsburgh, PA 15219 | XXXXXX2861 | Control account for collections from private patients to the NY business |
| PNC Bank, N.A. | 500 First Avenue Pittsburgh, PA 15219 | XXXXXX2888 | Control account for collections from private patients to the NJ business |
| PNC Bank, N.A. | 500 First Avenue Pittsburgh, PA 15219 | XXXXXX2896 | Control account for collections from Government payors to the NY business |
| PNC Bank, N.A. | 500 First Avenue Pittsburgh, PA 15219 | XXXXXX2909 | Control account for collections from Government payors to the NJ business |
| Chase Bank | 1100 Old Country Road Plainview, NY 11803 | XXXXXX9145 | Payroll account |
| Sterling National Bank | 290 Broadhollow Road Suite 402E Melville, NY 11747 | XXXXXX8581 | General collection and disbursement account |

73.    In the ordinary course of its business the Debtor receives, deposits, and issues checks and wire transfers into and out of the Bank Accounts.

74.    The Debtor's review of its Bank Accounts over the past six months shows that the balances therein have not exceeded the FDIC's deposit insurance limits, and that it is highly unlikely that they will do so in the future.

### C. Debtor's Payroll

75.    As noted, the Debtor employs approximately 200 individuals (the "Employees").

76.    Payroll is processed every Wednesday.  The Employees are paid on a biweekly basis, with approximately half of the Employees being paid on the first Wednesday of the month and the other half being paid on the second Wednesday of the month, and so on.

77.    Payroll is processed by ADP Payroll Services ("ADP"), which maintains offices at 1 ADP Boulevard, Roseland, NJ.

78.    The Debtor uses a dedicated payroll account that is held with Chase Bank ("Chase").

79.    No employee is owed wages exceeding the statutory limit of $12,475.00 under Bankruptcy Code section 507(a)(4), and generally no employee of the Debtor is paid an excessive salary.

80.    As noted, all payroll taxes are current.

81.    The Debtor also seeks an order authorizing it, but not directing it, to honor all liabilities to its Employees with respect to vacation, sick pay benefits, personal days, and paid holidays that arose prior to the Petition Date and to continue its pre-petition policies with respect to same going forward.

82.    The Debtor anticipates that its Employees will utilize any accrued vacation, sick leave, or personal days in the ordinary course, without resulting in any material cash flow requirements beyond the Debtor's normal payroll obligations.

### D. Debtor's Utilities

83.    In the operation of the business, PHS incurs utility expenses in the ordinary course of business for, among other things, water, heat, electricity, and telephone service.

84.    The following is a list of the Debtor's utility companies along with the proposed amounts for two-week deposits:

| Utility Company & Address | Type of Service | Account Number | Proposed Security Deposit |
|---|---|---|---|
| Con Edison JAF Station PO Box 1702 New York, NY  10116-1702 | Electric | 52-2009-0458-0008-3 | $500.00 |

| | | | |
|---|---|---|---|
| UGI Utilities, Inc<br>P O Box 15523<br>Wilmington, DE 19886-5523 | Gas | 519391909266 | $250.00 |
| PPL Electric Utilities<br>2 North 9th Street CPC-GENN1<br>Allentown, Pa 18101-117 | Electric | 19889-74037 | $500.00 |
| PSE&G<br>PO Box 14444<br>New Brunswick, NJ  08906-4444 | Electric | 69 972 538 06 | $500.00 |
| JCP&L<br>PO Box 3687<br>Akron, OH 44309-3687 | Electric | 100-060-723-465 | $1,500.00 |
| PSEGLI<br>PO Box 9039<br>Hicksville, NY  11802-9039 | Electric | 0394-8009-17-4<br>0394-8009-15-8 | $2,500.00 |
| National Grid<br>PO Box 11791<br>Newark NJ 07101-4791 | Gas | 07354-63028 | $1,250.00 |
| Elizabethtown Gas<br>PO Box 11811<br>Newark, NJ  07101-8111 | Gas | | $250.00 |
| New Jersey American Water<br>Box 371331<br>Pittsburgh, PA  15250-7331 | Water | 52-0415768-8 | |
| The Borough of Sayreville<br>Water<br>167 Main Street<br>Sayreville, NJ 08872 | Water | A1801447000<br>A1801447001<br>A1801448000<br>A1801448001 | $250.00 |

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: December 31, 2014

_/s/ Winthrop Hayes_
WINTHROP HAYES

4828-8637-2641, v. 1

# EXHIBIT A

| | 1/2 | 1/9 | 1/16 | 1/23 | 1/30 | 2/6 | 2/13 | 2/20 | 2/27 | 3/6 | 3/13 | 3/20 | 3/27 | 4/3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Collections | 200,000 | 460,000 | 500,000 | 475,000 | 475,000 | 425,000 | 425,000 | 425,000 | 425,000 | 475,000 | 475,000 | 475,000 | 475,000 | 475,000 |
| Charges | 204,000 | 220,000 | 175,000 | 210,000 | 175,000 | 210,000 | 157,700 | 210,000 | 157,700 | 210,000 | 131,875 | 210,000 | 131,875 | 210,000 |
| Payroll & Employee Benefits | | 1,500 | 5,000 | 1,500 | 20,000 | 1,500 | 5,000 | 1,500 | 1,500 | 1,500 | 20,000 | 20,000 | 20,000 | 1,500 |
| Temp Staffing & Outsourced Collections | 1,500 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 15,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| Rent & Utilities | 15,000 | 46,000 | 46,000 | 46,000 | 46,000 | 46,000 | 46,000 | 46,000 | 46,000 | 46,000 | 46,000 | 46,000 | 46,000 | 46,000 |
| Product Purchases | 9,000 | 7,500 | 53,700 | 7,500 | 9,000 | 9,000 | 53,700 | 9,000 | 7,500 | 9,000 | 53,700 | 7,500 | 7,500 | 7,500 |
| Software | 75,000 | 53,700 | 100,000 | 125,000 | 53,700 | 53,700 | 100,000 | 53,700 | 55,200 | 53,700 | 100,000 | 53,700 | 55,200 | 55,200 |
| Product Purchases | 100,000 | 100,000 | 100,000 | 100,000 | 75,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 |
| Software | | | 100,000 | | 100,000 | 75,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 |
| Insurance | 19,500 | 10,000 | 10,000 | 10,000 | 19,500 | 19,500 | 10,000 | 19,500 | 19,500 | 19,500 | 19,500 | 19,500 | 19,500 | 19,500 |
| Bank Fees & Interest | 945 | 4,993 | 4,993 | 9,905 | 4,993 | 9,905 | 4,993 | | 9,905 | 4,993 | | 4,993 | | 945 |
| Patient Reimbursement | | | | | | | | | | | | | | |
| Restructuring Fees | 62,211 | 500 | 500 | 15,000 | 45,000 | 45,000 | 500 | 15,000 | 15,000 | 45,000 | 500 | 500 | 15,000 | 45,000 |
| Office of U.S. Trustee (Quarterly Fees) | | | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| Lesser Capital | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 325 | 25,000 | 25,000 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 |
| Total Disbursements | 282,156 | 394,500 | 422,193 | 390,500 | 424,000 | 441,730 | 402,693 | 390,500 | 396,700 | 460,155 | 360,818 | 384,250 | 339,625 | 497,395 |
| Change in Cash | (82,156) | 5,500 | 77,807 | 84,500 | 51,000 | (16,730) | 22,107 | 34,500 | 28,300 | 14,845 | 114,182 | 90,750 | 135,375 | (22,395) |
| HldCap Line Reduction | 0 | 4,950 | 76,050 | 76,050 | 45,900 | 0 | 19,896 | 31,050 | 25,470 | 13,361 | 102,764 | 81,675 | 121,838 | 0 |
| Beginning Cash Balance | 83,094 | 938 | 1,488 | 9,268 | 17,718 | 22,818 | 6,088 | 8,299 | 11,749 | 14,579 | 16,064 | 27,482 | 36,557 | 50,094 |
| Ending Cash Balance | 938 | 1,488 | 9,268 | 17,718 | 22,818 | 6,088 | 8,299 | 11,749 | 14,579 | 16,064 | 27,482 | 36,557 | 50,094 | 27,699 |