**TRENK, DiPASQUALE,**
**DELLA FERA & SODONO, P.C.**
347 Mt. Pleasant Avenue, Suite 300
West Orange, NJ 07052
(973) 243-8600
Joseph J. DiPasquale, Esq.
Thomas M. Walsh, Esq.
*Counsel for the Chapter 11 Debtors and Debtors-in-Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| **PASSAIC HEALTHCARE SERVICES, LLC d/b/a ALLCARE MEDICAL, *et al.,*** | Case No. 14-36129 (CMG) |
| Debtors. | (Jointly Administered) |

## DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE FOR PLAN OF ORDERLY LIQUIDATION

# TABLE OF CONTENTS

**PAGE**

I.   SUMMARY ....................................................................................................... 1

II.  INTRODUCTION ............................................................................................. 2

    A.   Background .............................................................................................. 2

III. GENERAL INFORMATION ........................................................................... 3

    A.   Debtors' Organizational Structure ......................................................... 3

    B.   Description of the Debtors' Businesses as of the Filing Date ............... 3

    C.   The Debtors' Pre-Petition Indebtedness ............................................... 4

        1.   Secured Creditors........................................................................... 4

    D.   Events Precipitating the Chapter 11 Filings ......................................... 8

        1.   Net Revenue/Cash Collection Issues ............................................ 8

        2.   Medicare Price Reductions ............................................................ 8

        3.   Landauer's Breach of Agreement .................................................. 9

        4.   Unsustainable Expansion ............................................................... 9

        5.   Mounting Debt Service & Diminished Working Capital ............. 10

        6.   Litigation........................................................................................ 10

        7.   Inability to Sell Business .............................................................. 10

IV.  SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASES ........... 11

    A.   First Day Motions and Orders ............................................................... 11

        1.   Cash Collateral of Secured Creditors........................................... 11

        2.   Employee Compensation ................................................................ 11

        3.   Cash Management System .............................................................. 12

        4.   Utilities........................................................................................... 12

        5.   Administrative Order for Professionals ........................................ 12

    B.   Other Motions ........................................................................................ 12

        1.   Employment and Compensation of Advisors............................... 12

        2.   Rejection of Executory Contracts and Unexpired Leases ........... 12

        3.   Motion for Joint Administration ................................................... 13

    C.   Appointment of the Committee.............................................................. 13

    D.   Claims Process and Bar Date ................................................................ 13

        1.   Section 341(a) Meeting of Creditors ........................................... 13

|  | 2. | Schedules and Statements | 13 |
|  | 3. | Bar Date | 13 |
| E. | | Motion to Enter Into Medstar Agreement | 13 |
| F. | | Adversary Proceeding | 14 |
| V. | | CONFIRMATION AND VOTING PROCEDURES | 14 |
| A. | | Introduction | 14 |
| B. | | Confirmation Procedure | 14 |
|  | 1. | Confirmation Hearing | 14 |
|  | 2. | Procedure for Objections | 15 |
|  | 3. | Requirements for Confirmation | 15 |
|  | 4. | Classification of Claims and Equity Interests | 15 |
|  | 5. | Impaired Claims or Equity Interests | 15 |
|  | 6. | Eligibility to Vote on the Plan | 16 |
|  | 7. | Solicitation Package | 16 |
|  | 8. | Procedure/Voting Deadlines | 16 |
|  | 9. | Acceptance of the Plan | 17 |
| VI. | | SUMMARY OF KEY TERMS OF THE PLAN | 18 |
| A. | | Summary of Classification, Treatment and Voting | 18 |
| B. | | Modification of Treatment of Claims and Equity Interests | 21 |
| C. | | Appointment of the Plan Administrator | 21 |
| D. | | Substantive Consolidation of the Debtors' Estates | 21 |
| E. | | Means for Implementation of the Plan | 22 |
|  | 1. | Pooled Rights and Distributions | 22 |
|  | 2. | Funding of the Pooled Account. | 24 |
|  | 3. | Funding of the GUC Distribution Account | 24 |
|  | 4. | Funding of Other Liabilities. | 24 |
| F. | | Injunction | 25 |
| G. | | Exculpation | 25 |
| H. | | Releases | 25 |
|  | 1. | Releases by the Debtors | 25 |
|  | 2. | Releases among the Releasing Parties | 26 |
| I. | | Rejection of Executory Contracts and Unexpired Leases | 27 |
| J. | | Conditions Precedent to the Effective Date | 27 |

K.    Retention of Jurisdiction ................................................................................ 28

L.    Dissolution of Debtors .................................................................................. 28

VII.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES ....................................... 28

A.    Tax Consequences to the Debtors.................................................................. 29

B.    Tax Consequences to Creditors..................................................................... 29

    1.    Holders of Claims ................................................................................ 29

    2.    Non-United States Persons ................................................................... 30

C.    Importance of Obtaining Professional Tax Assistance.................................... 30

VIII.    CERTAIN RISK FACTORS TO BE CONSIDERED ............................................... 30

A.    Risk of Non-Confirmation of Plan ................................................................ 31

B.    Delays of Confirmation and/or Effective Date ............................................... 31

C.    Alternative Plan............................................................................................ 31

# I.
# SUMMARY

THIS DISCLOSURE STATEMENT ("DISCLOSURE STATEMENT") FOR PASSAIC HEALTHCARE SERVICES, LLC D/B/A ALLCARE MEDICAL ("PHS"), GALLOPING HILL SURGICAL LLC D/B/A ALLCARE MEDICAL ("GALLOPING HILL") AND ALLCARE MEDICAL SNJ D/B/A ALLCARE MEDICAL ("ALLCARE SNJ") WHICH TOGETHER WITH PHS ARE COLLECTIVELY, THE "DEBTORS") PLAN OF ORDERLY LIQUIDATION, ATTACHED AS EXHIBIT A (THE "PLAN"), AND RELATED MATERIALS DELIVERED HEREWITH ARE BEING PROVIDED BY THE DEBTORS TO KNOWN HOLDERS OF CLAIMS AND EQUITY INTERESTS PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE.[1]

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY INDICATED HEREIN. THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND EQUITY INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS. CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX

---

[1] All capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Plan.

ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE.  HOWEVER, IF THE COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTORS AND ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.

THE PLAN REPRESENTS A COMPROMISE OF ISSUES/DISPUTES BETWEEN ESSEX CAPITAL, SEQUOIA, DEBTORS AND THE COMMITTEE, WHICH WILL SAVE SUBSTANTIAL LEGAL FEES AND WHOSE OUTCOME WOULD OTHERWISE BE UNCERTAIN.   THE PARTIES ATTEMPTED TO INCLUDE McKESSON IN THIS COMPROMISE, BUT WERE UNSUCCESSFUL.  AS SUCH, THE ISSUES REGARDING McKESSON AND ALL OTHER PARTIES ARE GOING TO MANDATORY MEDIATION.

## II.
## INTRODUCTION

### A.    Background

On December 31, 2014 (the "First Filing Date"), PHS filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Code") in this Court.  On January 6, 2015 (the "Second Filing Date" and, with the First Filing Date the "Filing Date"), Galloping Hill and Allcare SNJ each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  After the Filing Date, the Debtors have remained in possession of their assets and management of their businesses as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. As described below, on or about February 1, 2015, pursuant to Bankruptcy Court Order, the Debtors turned over collection and management of their accounts receivable and future revenues to Medstar.

A hearing to consider the confirmation of the Plan will be held on_____, 2015 at _:00 _.m., prevailing Eastern Time, before the Honorable Christine M. Gravelle, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of New Jersey, Clarkson S. Fisher U.S. Courthouse, 402 East State Street, Trenton, NJ 08608. The Bankruptcy Court has directed that objections, if any, to the confirmation of the Plan must be filed and served so that they are received on or before _____, 2015, by 4:00 p.m., prevailing Eastern Time. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice.

Attached as **Exhibit A** to this Disclosure Statement is a copy of the Plan.

## III.
## GENERAL INFORMATION

### A.    Debtors' Organizational Structure

PHS is a limited liability company organized pursuant to the New Jersey Limited Liability Act on March 17, 2009. PHS is currently governed by the Second Amended and Restated Operating Agreement. Winthrop Hayes is the Debtors' President. Sequoia (defined infra) is approximately 72% owner of PHS.

PHS holds one hundred percent (100%) of the equity in Galloping Hill and Allcare SNJ. PHS obtained the equity of these entities through a Membership Interest Purchase Agreement entered on November 13, 2012, by and among the PHS, Galloping Hill, Allcare SNJ, Richard Lerner and Robert O'Connor. Galloping Hill and Allcare SNJ both did business as Allcare Medical. Upon consummating its acquisition of these entities, PHS began using "Allcare Medical" as the trade name for its entire business, and discontinued marketing under the name C&C Homecare, Inc. ("C&C").

### B.    Description of the Debtors' Businesses as of the Filing Date

The Debtors were a full service durable medical equipment ("DME") company specializing in clinical respiratory, wound care and support services. From the initial call to setup and instruction of the equipment, the Debtors' assessment and reassessment programs were geared towards a higher level of patient compliance.

Generally, the Debtors have three (3) lines of business:

i.    the supply of DME, including respiratory equipment and accessories, wheelchairs and accessories, mobility products, and daily living aids;

ii.    the provision of DME, respiratory equipment and supplies to patients receiving care from a hospice agency; and

iii.    sale of disposable/consumable medical supplies (e..g, diapers, nutritional formula, etc.).

The Debtors' revenues are generated by the foregoing lines of business, in part through the collection of accounts receivable and other cash collections.

PHS was formerly known as C&C. In December 2010, PHS acquired substantially all of the assets of C&C and Extended Care Concepts, LLC through a bankruptcy sale under Bankruptcy Code section 363. Prior to the acquisition of these assets, PHS had no business operations. In order to maintain continuity with the patients and accounts that PHS serviced subsequent to the asset purchase, PHS did business as C&C.

As of the Filing Date, PHS's headquarters were located in Plainview, New York and had approximately 200 employees.

## C.    The Debtors' Pre-Petition Indebtedness

### 1.  Secured Creditors

#### a.    MidCap Funding IV Trust ("MidCap Funding")

On or about October 15, 2013, the Debtors entered into a Credit and Security Agreement (the "MidCap Agreement") with MidCap Financial Trust ("MidCap Financial").  Under the MidCap Agreement, MidCap Financial agreed to make certain revolving loans in accordance with the terms and conditions set forth therein.  More specifically, the parties agreed to a "Revolving Loan Commitment Amount" of fifteen million dollars ($15,000,000), along with a potential "Additional Tranche" in the amount of ten million dollars ($10,000,000).

The Debtors granted MidCap Financial a first priority lien on, and security interest in certain personal property.  On or about October 15, 2013, MidCap Financial filed a UCC Financing Statement asserting a security interest in, among other things, "all of the Debtors' assets, including without limitation, all of Debtors' right, title and interest in and to the following . . . (a) all goods, Accounts (including health-care insurance receivables), Equipment, Inventory, contract rights or rights to payment . . . ."

On or about October 24, 2014, MidCap Financial filed a UCC Financing Statement Amendment assigning its rights to MidCap Funding IV Trust ("MidCap Funding").

The Debtors' books and records reflect that MidCap Funding is owed approximately $6,415,303 as of the Filing Date.  MidCap Funding has a first lien on all of the Debtors' assets.

On April 14, 2015, the Court entered the Final Order Authorizing Debtors' Use of Cash Collateral and Allowing Claim or MidCap Funding IV Trust ("Final Cash Collateral Order").  All of the protections and rights afforded to MidCap Funding in the Final Cash Collateral Order are fully incorporated in the Plan.

#### b.    Sequoia Healthcare Services, LLC ("Sequoia")

On or about November 13, 2012, the Debtors entered into a Term Note and Term Loan and Security Agreement with Sequoia (collectively, the "Sequoia Loan Documents").  Under the Sequoia Loan Documents, the Debtors received a loan in the amount of $7,096,020 (the "Sequoia Loan").

As collateral for the Sequoia Loan, Sequoia obtained a security interest in all assets of PHS, Galloping Hill and Allcare SNJ, including, among other property, accounts, contracts, assigned contracts, deposit accounts, intangibles, goods, equipment, and inventory.  In connection with the Sequoia Loan, on or about November 21, 2012, Sequoia filed a UCC Financing Statement asserting a security interest in "[a]ll assets of the Debtor."

Subsequently, on October 15, 2013, the same day that the Debtors entered into the MidCap Agreement, the Debtors, and Sequoia, entered into a new Note and Amended and

Restated Term Loan and Security Agreement (collectively, the "Amended Sequoia Loan Documents"). The purpose of the Amended Sequoia Loan Documents was to enable PHS and its co-borrowers to obtain additional financing from MidCap Funding.

Under the Amended Sequoia Loan Documents, the Debtors received a loan in the amount of $6,850,730 following the application of certain credits and the conveyance of additional working capital (the "Restated Sequoia Loan").

As collateral for the Restated Sequoia Loan, Sequoia obtained a security interest in all assets of PHS, Galloping Hill and Allcare SNJ, including, among other property, accounts, contracts, assigned contracts, deposit accounts, intangibles, goods, equipment, and inventory. In connection with the Restated Sequoia Loan, on or about October 17, 2013, Sequoia filed a UCC Financing Statement asserting a security interest in "all assets, personal and fixture property of every kind and nature[.]"

The description of the Sequoia Loan Documents and the Amended Sequoia Loan Documents herein is for summary purposes only, and the terms and provisions of the actual documents should be referred to for a complete description.

The Debtors' books and records reflect that Sequoia is owed approximately $11,880,690 as of the Filing Date. Sequoia has a second lien behind MidCap Funding on all of Debtors' assets.

### c.    McKesson Medical-Surgical Minnesota Supply, Inc. ("McKesson")

On or about August 15, 2011, PHS and McKesson entered into a Line of Credit Agreement whereby McKesson agreed to a $1,000,000 commitment (the "McKesson Agreement"). McKesson has historically served as PHS's primary source of consumable medical supplies.

On or about September 6, 2011, McKesson filed a UCC Financing Statement asserting a security interest in the Debtors' inventory. On October 31, 2011, McKesson filed a UCC Financing Statement Amendment restating its security interest in the Debtors' inventory. On October 17, 2013, McKesson filed another UCC Financing Statement Amendment further restating its security interest in the PHS's inventory. On October 15, 2013, McKesson and PHS entered into a new financing arrangement, which included a Financing Agreement by and between PHS and McKesson dated as of October 15, 2013, and a related Amended and Restated Security Agreement by and between PHS and McKesson dated as of the same date. The documentation for this transaction contains an acknowledgement by McKesson of the position of Essex Capital (see below), and contemporaneously amends, restates, and supersedes in its entirety McKesson's prior security interest.

PHS's books and records reflect that McKesson is owed approximately $8,762,078 as of the Filing Date. The Debtors dispute the extent, validity and priority of McKesson's alleged secured claim. The liens and relative lien-priorities held by McKesson are also disputed by Sequoia and Essex, which disputes are proposed to be resolved through the Plan.

### d.    Essex Capital Corporation ("Essex Capital")[2]

Since in or about June 2011, PHS has entered into eleven (11) equipment lease agreements with Essex Capital for the lease of equipment needed for the Debtors' day-to-day operations (collectively, the "Essex Capital Leases").

Essex Capital has filed various UCC Financing Statements in connection with the equipment covered by the Essex Capital Leases. Essex asserts an ownership interest in approximately two-thirds (2/3) of the Debtors' DME, which ownership claim is disputed by, among others, McKesson.

The Debtors' books and records reflect that Essex Capital is owed approximately $2,640,376 as of the Filing Date. Essex Capital also claims a post-petition rent of approximately $1.5 million through April 2015 (accruing approximately $332,000 per month).

On February 10, 2015, the Debtors filed a Motion to reject certain leases and executory contracts, including the Essex Capital Leases (Docket No. 160). This Motion has never been ruled on and is proposed to be resolved through the Plan.

Also, on February 10, 2015, Essex Capital filed a Motion for Entry of an Order (I) Compelling Debtors Pursuant to 11 U.S.C. §365(d)(5) to Perform All Lease Obligations as of March 1, 2015 and (II) Providing Essex Capital With Adequate Protection Pursuant to 11 U.S.C. §363(c) and Fed.R.Bankr.P. 4001. A determination as to ownership of the DME and to whether Essex Capital is entitled to adequate protection has never been made and is proposed to be resolved through the Plan.

### e.    **Other UCC-Holders**

The following parties are also secured creditors of PHS and, upon information and belief, maintain active UCC Financing Statements in connection with alleged security interests in property of PHS:[3]

i.    LCA Bank Corporation ("LCA"): filed UCC Financing Statement on or about March 27, 2014, asserting a security interest in certain equipment (and proceeds thereof) as set forth in a related Equipment Finance and Security Agreement No. 131822-001. PHS's records reflect that LCA is owed $21,323.96. LCA submitted a correspondence demanding $67,901.59, however this amount included an acceleration of future lease payments.

---

[2]  Essex Capital includes its affiliate, Cornerstone Essex Leasing Co., LLC.

[3]  In addition, the following parties maintain active UCC Financing Statements in connection with alleged security interests in property of PHS, but do not have any claims against PHS; stated otherwise, PHS maintains a zero balance with these parties: (i) Capital One, N.A., which filed a UCC Financing Statement on or about October 20, 2011; (ii) Key Equipment Finance, Inc, (upon information and belief, d/b/a Respironics), which filed a UCC Financing Statement on or about October 4, 2011; and (iii) VGM Financial Services, a division of TCF Equipment Finance, Inc., which maintains active UCC Financing Statements in New York (Filing No. 201201245092920, filed January 24, 2012) and New Jersey (Filing No. 50442472, filed February 7, 2013).

     ii.     NMHG Financial Services, Inc. ("NMHG"): filed UCC Financing Statements on or about March 15, 2012, asserting security interests in "[a]ll of the equipment now or hereafter leased by Lessor to Lessee; and all accessions, additions, replacements, and substitutions thereto and therefore; and all proceeds including insurance proceeds thereof." PHS's records reflect that NMHG is owed $830.76.

     iii.     Marlin Business Bank (upon information and belief, d/b/a Constructure Technologies, LLC a/k/a Marlin Leasing) ("Marlin"): filed UCC Financing Statement in or about 2013 (day/date illegible – filing number 201312260717209) asserting a security interest in certain goods (and proceeds thereof). PHS's records reflect that Marlin is owed $32,341.49.

     iv.     Medela, Inc. ("Medela"): filed a UCC Financing Statement on or about August 15, 2013, asserting a security interest in certain leased equipment as specifically set forth therein. PHS's records reflect that Medela is owed $20,564.00. Medela submitted a correspondence demanding $196,257.54, however this amount represented the purchase price of equipment being rented by PHS.

     v.     Philips Medical Capital, LLC ("Philips"): maintains multiple, active UCC Financing Statements: (a) New York Filing No. 201304125397056 (filed April 12, 2013): asserting security interest in connection with equipment leased or financed by Contract No. 101-10013364 and Lease No. 101-10013364; (b) New York Filing No. 201304125397068 (filed April 12, 2013): asserting security interest in connection with equipment leased or financed by Contract No. 101-10013383 and Lease No. 101-10013383; (c) New York Filing No. 201309206003037 (filed September 20, 2013): asserting security interest in connection with equipment leased or financed by Contract No. 101-10026359 Lease No. 101-10026359; (d) New York Filing No. 201309206003049 (filed September 20, 2013): asserting security interest in connection with equipment leased or financed by Contract No. 101-10026312 and Lease No. 101-10026312; (e) New York Filing No. 201309206003051 (filed September 20, 2013): asserting security interest in connection with equipment leased or financed by Contract No. 101-10026363 and Lease No. 101-10026363; (f) New York Filing No. 201401065012827 (filed January 6, 2014): asserting security interest in connection with equipment leased or financed by Contract No. 101-10036075 and Lease No. 101-10026363; (g) New York Filing No. 201401065012877 (filed January 6, 2014): asserting security interest in connection with equipment leased or financed by Contract No. 101-10036147 and Lease No. 101-10036147; (h) New York Filing No. 201401065012889 (filed January 6, 2014): asserting security interest in connection with equipment leased or financed by Contract No. 101-10036130 and Lease No. 101-10036130; (i) New Jersey Filing No. 50773022 (filed March 17, 2014): asserting security interest in connection with equipment leased or financed by Contract No. 101-10041609; (j) New Jersey Filing No. 50773031 (filed March 17, 2014): asserting security interest in connection with equipment leased or financed by Contract No. 101-10041609; (k) New York Filing No. 201403215283559 (filed March 21, 2014): asserting security interest in connection with equipment leased or financed by Contract No. 101-10041585 and Lease No. 101-10041585; and (l) New York Filing No. 201408205889537 (filed August 20, 2014):

asserting security interest in connection with equipment and other personal property leased or financed by Agreement No. L203415-000 dated August 12, 2014.  PHS's records reflect that Philips is owed $676,502.07.

### f.    Unsecured Debt

As of the Filing Date, the Debtors had approximately $12,675,000 of debt outstanding to non-insider unsecured creditors.  The debt amount does not include deficiency claims, which claims will likely be of significant dollar value.

## D.    Events Precipitating the Chapter 11 Filings

As summarized below, a variety of factors lead to the Debtors' bankruptcy filing.  It should be noted that before seeking relief under Chapter 11, the Debtors exerted considerable time, effort and due diligence to, among other things, improve its cash collection, streamline operations, market its business, and work out its debt obligations.  Unfortunately, the Debtors were unsuccessful, thus resulting in the need for these Chapter 11 filings.

### 1.    Net Revenue/Cash Collection Issues

In the years preceding the Debtors' bankruptcy filing, the Debtors' aforementioned lines of business, while sound and well-run, did not generate sufficient revenue to offset the costs incurred in connection with the Debtors' rapid expansion, which was largely necessitated by Medicare price reductions (see below).  The Debtors' expenses outpaced revenues, resulting in unanticipated revenue shortfalls and budgetary constraints.  In the first quarter of 2014, for instance, the Debtors experienced a net loss of $1,518,428.

A related issue facing the Debtors was the need to improve its order-to-cash processing, which is necessary to increase the amount of cash collected by the Debtors at a lower operating cost.  In its efforts to improve its order-to-cash processing, the Debtors retained GenPact, Ltd. ("GenPact"), a multi-national process consulting company with a dedicated healthcare revenue cycle practice.  GenPact staffed a three person team at the Debtors' locations for six weeks to identify opportunities and build a project plan to improve the Debtors' order-to-cash process.

Although GenPact's report identified many opportunities to increase cash collections while reducing costs, it was evident that the time and capital investment required to monetize these improvements would be undermined by the Debtors' near-term liquidity issues.

### 2.    Medicare Price Reductions

Medicare introduced a program specific to reimbursement for respiratory and DME products which relied upon competitive bidding.  Under this program, Medicare auctioned contracts to provide Medicare beneficiaries with DME and respiratory equipment.  PHS participated in this auction and placed 72 bids to provide various types of DME and respiratory equipment across the metropolitan region.  PHS was awarded 63 of the 72 contracts for which it bid.

Unfortunately, as a result of the auction process, the price paid by Medicare for the products furnished under these contracts represented an average decrease of forty-five percent (45%) to the price paid to PHS prior to the implementation of the competitive bidding program. The competitive bidding process used the median price of all winning bids in a given product category and region to establish the price going forward, meaning that in many cases PHS received a contracted price less than what the PHS had bid.

Shortly following the implementation of this new pricing in July 2013, many commercial insurance companies unilaterally reduced their reimbursements for DME and respiratory equipment to match the decline in Medicare pricing. The Debtors were unable to reduce their purchasing and other costs to accommodate the dramatically reduced pricing from Medicare and commercial insurance payors.

### 3.    Landauer's Breach of Agreement

Upon learning in January 2013 that it was awarded the Medicare contracts at dramatically reduced pricing, the Debtors explored many strategies to increase its volume and efficiency in order to address the price reductions under the new Medicare contracts.

In March 2013, PHS executed a binding letter-of-intent to acquire Landauer Metropolitan, Inc. ("Landauer"), the largest regional DME and respiratory equipment provider in the Northeast. The Debtors believed that by acquiring Landauer, and integrating the Debtors' operations into Landauer, the Debtors would achieve the scale and operating efficiencies necessary to cope with the dramatic price reductions.

Unfortunately, after executing the binding letter-of-intent and jointly announcing the transaction publicly, Landauer's ownership terminated the sale and signed merger agreements with two other DME and respiratory providers. The Debtors filed breach of contract claims against Landauer.

### 4.    Unsustainable Expansion

The timing of Landauer's termination of the agreement in April 2013 left the Debtors with little time to prepare an alternative strategy to address the pricing cuts that would be made effective in July 2013. In the remaining months prior to the implementation of the Medicare price reductions, the Debtors developed an internal plan to increase volume. The Debtors hired a large sales staff and substantially expanded its operations teams to address the expected increase in volume. Due to the capital-intensive nature of the DME business, particularly for growing DME companies, the Debtors worked with new and existing secured lenders to establish a capitalization plan for the business. The capitalization plan was intended to address an anticipated operating cash deficit the Debtors budgeted to experience through the first half of 2014 due to the expected growth in the business.

The actual operating cash deficits were significantly greater and persisted longer than the Debtors budgeted for two primary reasons: (i) the Debtors lacked adequate systems and personnel to properly bill and collect from third-party insurance payors; and (ii) the new business generated by the Debtors' DME and respiratory business line substantially under-performed the

Debtors' expectations.  The Debtors' difficulty in billing and collecting stemmed from the shift in products and payors that made up the Debtors' new volume.  In addition, the Debtors were in the process of consolidating from two separate billing and collections systems to one.  Managing the integration of its billing systems while simultaneously bringing on new staff and substantial volume increases overwhelmed the Debtors' resources and contributed to the Debtors' difficulties in collecting from payors.

### 5.   Mounting Debt Service & Diminished Working Capital

As specifically discussed elsewhere herein, the Debtors' debt obligations reached unmanageable levels in part due to the Debtors' other challenges, including the Debtors' rapid expansion.

Further compounding the Debtors' dilemma was that MidCap Funding began reducing the cash available under the Debtors' line of credit in response to the Debtors' cash collection challenges.  These reductions to credit line availability exacerbated the Debtors' liquidity challenges.

Although the Debtors endeavored to work amicably with its secured creditors to resolve its fiscal issues, no viable solution materialized.

### 6.   Litigation

Complaints filed against the Debtors further contributed to the Debtors need to file bankruptcy.  Subsequent to the Debtors' filing of breach of contract claims against Landauer, which alleged violations of the standstill provisions under the binding letter of intent, Landauer filed counterclaims against the Debtors alleging breach of contract related to a non-disclosure agreement.

Subsequently, Landauer filed for bankruptcy in July 2013, and the Debtors' claims against Landauer Metropolitan were stayed.

In addition, Wendy Bartlett, a former employee, has filed a complaint alleging she was not paid for overtime.  PHS believes Ms. Bartlett was paid appropriately during her employment with PHS.

### 7.   Inability to Sell Business

In its efforts to identify a buyer for some or all of the Debtors' business, the Debtors contacted many regional DME providers that would represent natural acquirers for the business.

However, many DME providers and the industry in general are struggling with several of the factors that have contributed to the Debtors' own financial challenges, and therefore were unable to provide offers that would fairly value the assets of the Debtors' business.

## IV.
## SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASES

The following is a brief description of certain major events that have occurred during this Chapter 11 Cases.

### A.    First Day Motions and Orders

On the Filing Date, in addition to the voluntary petition for relief filed by the Debtors under Chapter 11 of the Bankruptcy Code, the Debtors also filed a number of motions and applications (collectively, the "First Day Motions") seeking certain "first day" relief. The purpose of such First Day Motions was to ensure that the Debtors were able to transition into the Chapter 11 process with as little disruption to their businesses as possible and to function smoothly pending an expedited liquidation of the Debtors' businesses. Within a few days of the Filing Date, the Bankruptcy Court entered several orders (the "First Day Orders"), as more particularly described as follows:

### 1.    Cash Collateral of Secured Creditors

The Debtors sought interim and, ultimately, final use of the cash collateral of its secured creditors. The Bankruptcy Court authorized the Debtors to use the cash collateral pursuant to the terms and conditions set forth in the Interim Cash Collateral Order and granting the secured creditors adequate protection for the use of their cash collateral. The Debtors have sought use of the cash collateral on a second and third interim basis. On April 14, 2015, the Court entered Final Order Authorizing Debtors' Use of Cash Collateral and Allowing Claim of MidCap Funding IV Trust.

### 2.    Employee Compensation

The Debtors sought authority to pay all employees their wage claims in the ordinary course of business. Additionally, among other things, the Debtors requested authority to continue all of their prepetition benefit programs. This relief allowed the Debtors to maintain employee morale and prevent costly distractions and retention issues. Absent the ability to honor prepetition wages, salaries, benefits and other similar employee-related programs, the Debtors would have likely suffered significant losses at a time when they needed to stabilize their operations. Without the relief requested, the Debtors believed that employees may have sought alterative employment opportunities, thereby depleting the Debtors' workforce, hindering the Debtors' ability to meet their customer obligations, and likely diminishing stakeholder confidence in the Debtors' ability to liquidate their assets as a going concern. Accordingly, the Bankruptcy Court entered a First Day Order authorizing, but not directing, the Debtors to (A) honor prepetition claims and obligations for wages, salaries, employee benefits and other compensation, and (B) continue to provide certain employee benefits in the ordinary course of business.

### 3.   Cash Management System

The Debtors requested entry of an order authorizing the Debtors to continue using their existing cash management system and continue using their existing bank accounts and business forms. This relief allowed the Debtors to maintain uninterrupted business operations.

### 4.   Utilities

The Debtors relied on a number of utility service providers in the ordinary course of their business. In order to prevent the business interruption likely to result in the event of interruption of service of one or more utilities, the Debtors filed a First Day Motion deeming its utility service providers adequately assured of future performance. Accordingly, the Bankruptcy Court entered an Interim Order granting the utilities motion and scheduling a final hearing on adequate assurance for a later date. Thereafter, a Final Order deeming utilities adequately assured of future performance was entered.

### 5.   Administrative Order for Professionals

The Debtors filed a Motion for entry of an Order governing administrative procedures relating to the interim compensation and reimbursement of expenses of professionals of the Debtor. The Motion was granted.

## B.   Other Motions

On the Filing Date and during the Chapter 11 Cases, the Debtors also filed several other significant motions related to the administration of the Chapter 11 Cases.

### 1.   Employment and Compensation of Advisors

To assist the Debtors in carrying out their duties as debtors in possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Debtors filed a motion seeking authorization to retain and employ Trenk, DiPasquale, Della Fera & Sodono, P.C. ("Trenk DiPasquale"), as counsel to the Debtors. The Debtors also requested approval of certain procedures for the interim compensation and reimbursement of professionals in the Chapter 11 Cases. On February 9, 2015, the Court entered an Order authorizing the retention of Trenk DiPasquale.

### 2.   Rejection of Executory Contracts and Unexpired Leases

On January 20, 2015, the Debtors filed a Motion to reject certain unexpired leases and executory contracts, which request was granted on February 17, 2015. On February 10, 2015, the Debtors filed a second Motion to reject certain unexpired leases and executory contracts. On February 19, 2015, the Debtors filed a third Motion to reject an unexpired sublease with Deep Care, LLC.

12

### 3.    Motion for Joint Administration

On January 8, 2015, the Debtors filed a Motion for joint administration of their Chapter 11 cases, which was granted on that date.

## C.    Appointment of the Committee

On January 14, 2015, the Office of the United States Trustee for the District of New Jersey (the "UST") appointed the Committee. The members of the Committee are as follows: (a) Richard Lerner (Chairperson); (b) Essex Capital Corporation; (c) Invacare Corporation; (d) A-1 International, Inc.; and (e) Medline Industries, Inc..

To assist the Committee in carrying out their duties, the Committee sought to retain and employ Arent Fox LLP ("Arent Fox") as counsel to the Committee. The Committee also sought to retain CBIZ Accounting, Tax & Advisory of New York, LLC ("CBIZ") as financial advisors to the Committee. On February 23, 2015, the Court entered orders authorizing the Committee's retention of Arent Fox and CBIZ.

## D.    Claims Process and Bar Date

### 1.    Section 341(a) Meeting of Creditors

On February 19, 2015, the UST presided over the Section 341(a) meeting of creditors in the Chapter 11 Cases.

### 2.    Schedules and Statements

The Debtors filed with the Bankruptcy Court their Statements of Financial Affairs, Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases and Lists of Creditors and Equity Holders (collectively, the "Schedules") on February 3, 2015.

### 3.    Bar Date

The Bankruptcy Court fixed May 20, 2015 as the date by which Creditors have to file Proofs of Claims in these Chapter 11 Cases. The deadline for filing a Proof of Claim by a governmental unit (as defined by Section 101(27) of the Bankruptcy Code) is June 29, 2015. As of April 30, 2015, unsecured Proofs of Claim total approximately $6,725,815.68.

## E.    Motion to Enter Into Medstar Agreement

On January 21, 2015, the Debtors filed a Motion to enter into and for approval of a Management Agreement with MedStar Surgical & Breathing Equipment, Inc. The purpose of the Management Agreement is to provide durable medical equipment and other healthcare medical equipment to the Debtors, to provide medical billing and accounts receivable collection, and for management and other operation services. At the time of entering into the Medstar Agreement, the Debtors and Medstar projected approximately $19.8 million would be collected over the next three (3) years from Debtors' existing accounts receivable and future revenues. The Medstar

Agreement and all of its terms and conditions are fully incorporated into the Plan. The Motion was granted on January 30, 2015. The Plan is being funded from the continued collection of account receivables and future revenues collected pursuant to the Medstar Agreement, the sale of DME and inventory, and Causes of Action. As a result of the MedStar Agreement, the Debtors significantly reduced their overhead. The Debtors currently have approximately five (5) employees.

**F.    Adversary Proceeding**

On January 20, 2015, Essex Capital filed a complaint against the Debtors (i) to determine extent or ownership interest of Essex Capital in certain DME possessed by Debtors, and (ii) that the Essex Capital Leases are true leases and not disguised secured financing arrangements ("Adversary Proceeding"). On February 9, 2015, Essex Capital filed an Amended Complaint naming additional parties, McKesson and Sequoia. A dispute exists between Essex's ownership of the DME possessed by Debtors.

On April 7, 2015, the Court ordered mandatory mediation. As of the date hereof, the proposed mediation order has not been entered.

On April 4, 2015, McKesson filed a motion for withdrawal of the reference of the Adversary Proceeding. The Debtors, Essex and Sequoia are expected to oppose the motion to withdraw the reference.

The disputes among the Debtors, Essex Capital and Sequoia (and potentially the Committee) are proposed to be resolved as set forth in the Plan (as further described below). The Debtors intend to ask the Court to set a discovery and briefing schedule with regard to such disputes, with evidence to be presented in connection with the Confirmation Hearing so that the Court may adjudicate such disputes as part of the confirmation process.

# V.
## CONFIRMATION AND VOTING PROCEDURES

**A.    Introduction**

In formulating the Plan, the Debtors' goal was to find an acceptable method for satisfying the Claims of Creditors in accordance with the priorities and requirements of the Bankruptcy Code.

**B.    Confirmation Procedure**

**1.    Confirmation Hearing**

A hearing before the Honorable Christine M. Gravelle, United States Bankruptcy Judge, has been scheduled for _____, 2015 at _:00 _.m., at the United States Bankruptcy Court, Clarkson S. Fischer U.S. Courthouse, 402 East State Street, Trenton, New Jersey 08608 to consider confirmation of the Plan. The Confirmation Hearing may be adjourned from time to time

by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

### 2.    Procedure for Objections

Any objection to the confirmation of the Plan must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim held by the objector. Any such objection must be filed with the Bankruptcy Court and served on the Debtors' and Committee's counsel and all parties who have filed a notice of appearance by 4:00 pm prevailing Eastern Time on _____, 2015. Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court.

### 3.    Requirements for Confirmation

The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of Section 1129 of the Bankruptcy Code. Among the requirements for confirmation in these Chapter 11 Cases are that the Plan be: (i) accepted by all impaired classes of Claims and Equity Interests or, if rejected by an impaired class, that the Plan "does not discriminate unfairly" against and is "fair and equitable" with respect to such class; and (ii) feasible. The Bankruptcy Court must also find that:

- The Plan has classified claims and interests in a permissible manner;

- The Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and

- The Plan has been proposed in good faith.

### 4.    Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code requires the Plan to place a claim or equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Plan creates separate classes to deal respectively with secured claims, unsecured claims and equity interests. The Debtors believe that the Plan's classifications place substantially similar claims or equity interests in the same class and thus, meet the requirements of Section 1122 of the Bankruptcy Code.

### 5.    Impaired Claims or Equity Interests

Pursuant to Section 1126 of the Bankruptcy Code, only the Holders of Claims in Classes "Impaired" by the Plan and receiving a payment or distribution under the Plan may vote on the Plan. Pursuant to Section 1124 of the Bankruptcy Code, a Class of Claims may be "Impaired" if the Plan alters the legal, equitable or contractual rights of the Holders of such Claims or Interests treated in such Class. The Holders of Claims not Impaired by the Plan are deemed to accept the Plan and do not have the right to vote on the Plan. The Holders of Claims or Interests in any Class which will not receive any payment or distribution or retain any property pursuant to the Plan are deemed to reject the Plan and do not have the right to vote.

**6.      Eligibility to Vote on the Plan**

Unless otherwise ordered by the Bankruptcy Court, only Holders of Allowed Class 1 Claims through Class 6 Claims may vote on the Plan.  In order to vote on the Plan, you must hold a Claim in one or more of these classes and have timely filed a proof of Claim or have a Claim that is identified on the Schedules that is not listed as disputed, unliquidated or contingent, or be the holder of a Claim that has been temporarily Allowed for voting purposes only under Bankruptcy Rule 3018(a).

**7.      Solicitation Package**

Each person entitled to vote to accept or reject the Plan is being provided with (1) this Disclosure Statement; (2) the Plan; (3) notice of the Confirmation Hearing and objection deadline; (4) an appropriate ballot to be used in voting to accept or reject the Plan; and (5) a pre-addressed return envelope.  Any person who receives this Disclosure Statement but does not receive a ballot, and who believes that he/she is entitled to vote to accept or reject the Plan or who believes he/she received an incorrect ballot, should contact Joseph J. DiPasquale, Esq. or Thomas M. Walsh, Esq. at the address or telephone number set forth in this Disclosure Statement.  To ensure your vote is counted you must (i) complete the Ballot, (ii) indicate your decision either to accept or reject the Plan in the boxes provided on the Ballot, and (iii) sign and return the Ballot to the address set forth on the Ballot (please note that envelopes and prepaid postage have not been included with the Ballot). BALLOTS SENT BY FACSIMILE TRANSMISSION ARE NOT ALLOWED AND WILL NOT BE COUNTED.

**8.      Procedure/Voting Deadlines**

In order for your ballot to count, you must complete, date, sign and properly mail the enclosed  ballot to the following address:

**PASSAIC HEALTHCARE SERVICES, LLC, et al.**
**BALLOT PROCESSING CENTER**
**c/o Trenk DiPasquale Della Fera & Sodono, P.C.**
**Attn:  Lisa Marie Bonito**
**347 Mount Pleasant Avenue, Suite 300**
**West Orange, New Jersey 07052**

The Debtors' counsel must RECEIVE original ballots by mail or over delivery on or before _____, **2015 by 5:00 p.m.** (prevailing Eastern Time) (the "Voting Deadline"). Except as otherwise  provided, you may not change your vote once the Debtors' receives your ballot.

Any ballot that is timely received, that contains sufficient information to permit the identification of the claimant and that is cast as an acceptance or rejection of the Plan will be counted and will be  deemed to be cast as an acceptance or rejection, as the case may be, of the Plan.

The following ballots will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected:

   a.   any ballot received after the Voting Deadline, unless the Debtors grant an extension of the Voting Deadline with respect to such ballot;

   b.   any ballot that is illegible or contains insufficient information to permit the identification of the claimant;

   c.   any ballot cast by a person or entity that does not hold a Claim in a class that is entitled to vote to accept or reject the Plan;

   d.   any ballot cast for a Claim designated as unliquidated, contingent or disputed or as zero or unknown in amount and for which no Proof of Claim has been timely filed;

   e.   any ballot timely received that is cast in a manner that indicates neither acceptance nor rejection of the Plan or that indicates both acceptance and rejection of the Plan;

   f.   any unsigned ballot; or

   g.   any ballot that is electronically submitted.

**9.    Acceptance of the Plan**

As a Creditor, your acceptance of the Plan is important. In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Plan. At least one impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept the Plan. **YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY MAIL THE BALLOT ATTACHED TO THE NOTICE. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR.**

## VI.
## SUMMARY OF KEY TERMS OF THE PLAN

### A.      Summary of Classification, Treatment and Voting

| Class & Description | Estimated Allowed Claims | Treatment | Estimated Recovery to Holders of Allowed Claims |
|---|---|---|---|
| Class 1 – MidCap Funding Secured Claims | $7,063,146.13 | *Impaired and Entitled to Vote.* MidCap Funding shall retain all of its liens until all amounts due and payable under the Final Cash Collateral Order are paid in full, less the $150,000 carve-out and $270,000 (primarily default interest) or otherwise satisfied pursuant to a sale of the Debtors' assets; provided, however, MidCap Funding (a) shall not have a lien on the GUC Distribution Account; and (b) shall not participate in any Distribution from the GUC Distribution Account on account of any outstanding Claims under the Credit and Security Agreement. | 94% |
| Class 2 – Sequoia Secured Claims | $11,880,690 | *Impaired and Entitled to Vote.* All of the respective rights, interests and liens of Sequoia shall be pooled with all of the respective rights, interests and liens of Essex Capital and the Committee (on behalf of Unsecured Creditors) into the Pooled Rights. On account of the Pooled Rights, after payment of the MidCap Funding Claim, all of the assets of the Estates, including the proceeds from the DME Sales and the Non-DME Sales, shall be collected together as the Collected Amounts. From the Collected Amounts, on account of its portion of the Pooled Rights, Sequoia shall receive one-third (1/3) of the value of the DME Sales, and forty-five percent (45%) of the remaining value of the Collected Amounts (after payment of the GUC Distribution Portion); provided, however, Sequoia (a) shall not have a lien on the GUC Distribution Account; and (b) shall not participate in any Distribution from the GUC Distribution Account on account of any outstanding Claims under its loan documents. | Unknown |

| Class & Description | Estimated Allowed Claims | Treatment | Estimated Recovery to Holders of Allowed Claims |
|---|---|---|---|
| Class 3 – McKesson Disputed Secured Claims | $8,762,078 | *Impaired and Entitled to Vote.* McKesson has a first-priority lien on consumables (non-DME inventory) owned by PHS. In full and final satisfaction of such lien, on the Effective Date, or before if agreed to between the Debtors and McKesson, PHS shall abandon such consumables to McKesson, who may collect and dispose of such collateral in its discretion and at its own cost and expense. The value of the collateral thus received shall be credited against the remaining balance due to McKesson on the Line of Credit Agreement between McKesson and PHS. Any liens of McKesson on other assets of the Debtors, including on DME, are junior to the collective Pooled Rights of Sequoia and Essex Capital, each of which are impaired under the Plan. As such, McKesson's Claims will have a general unsecured deficiency claim pursuant to section 506(b) of the Bankruptcy Code, and McKesson shall share, pro rata, with any distributions made to the Holders of Claims in Class 6; provided, however, McKesson shall not have a lien on the GUC Distribution Account. | Unknown |
| Class 4– Other Secured Claims | TBD | *Impaired and Entitled to Vote.* Any liens held by Holders of Allowed Class 4 Claims are junior to the collective Pooled Rights of Sequoia and Essex Capital, each of which are impaired under the Plan. As such, Allowed Class 4 Claims will have general unsecured deficiency claims pursuant to section 506(b) of the Bankruptcy Code, and the Holders of Allowed Class 4 Claims shall share, pro rata, with any distributions made to the Holders of Claims in Class 6. | Unknown |

| Class & Description | Estimated Allowed Claims | Treatment | Estimated Recovery to Holders of Allowed Claims |
|---|---|---|---|
| Class 5 – Essex Capital Corporation Lessee | TBD | *Impaired and Entitled to Vote.* All of the respective rights, interests and liens of Essex Capital shall be pooled with all of the respective rights and liens of Sequoia and the Committee into the Pooled Rights.  On account of the Pooled Rights, after payment of the MidCap Funding Claim, all of the Assets of the Estates, including the proceeds from the DME Sales and the Non-DME Sales, shall be collected together as the Collected Amounts. From the Collected Amounts, on account of its portion of the Pooled Rights, Essex Capital shall receive two-thirds (2/3) of the value of the DME Sales, and fifty-five percent (55%) of the remaining value of the Collected Amounts (after payment of the GUC Distribution Portion*); provided, however, Essex Capital (a) shall not have a lien on the GUC Distribution Account; and (b) shall not participate in any Distribution from the GUC Distribution Account on account of any outstanding Claims  under its lease documents. | Unknown |
| Class 6 – Unsecured Claims | $13,000,000 | *Impaired and Entitled to Vote.*  Holders of Allowed Class 6 Claims shall be paid, in full and final satisfaction of their Class 6 Claims, Cash equal to their Pro Rata share of the GUC Distribution Account once the Pooled Account has been funded within seven (7) Business Days after such General Unsecured Claim becomes an Allowed Claim  or as soon thereafter as is  practicable. | Unknown[4] |
| Class 7 – Equity Interests | N/A | *Impaired and Not Entitled to Vote.*  The Holders of the Class 7 Equity Interests will not receive any distribution on account of such interests.  On the Effective Date, all Class 7 Equity Interests shall be cancelled, extinguished and of no further force and effect. | 0% |

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified and are excluded from the foregoing classification (as set forth in Article II of the Plan).

---

[4]  The estimated recovery is impossible to predict at this time based upon, among other things, an estimate of the Allowed Claims  in the Chapter 11 Cases.  Debtors do not know how much money will be leftover after paying the MidCap Allowed Claim.  In addition, the Debtors do not know what the total amount of administrative fees, including professional costs, will amount to by the end of the Chapter 11 Cases.

**B.**     **Modification of Treatment of Claims and Equity Interests**

The Debtors reserve the right to modify the treatment of any Allowed Claim in any manner adverse only to the Holder of such Claim at any time after the Effective Date upon the consent of the Holder of the Claim whose Allowed Claim is being adversely affected.

**C.**     **Appointment of the Plan Administrator**

On the Effective Date, a Plan Administrator, who shall be jointly selected by the Debtors and the Committee no later than the Confirmation Hearing, shall be appointed and thereafter serve in accordance with the Plan. The Debtors and the Committee's proposed selection shall be noticed to parties-in-interest by e-filing a notice of same with the Court (at least three (3) days before Confirmation hearing) and any objections to the proposed selection may be raised at the Confirmation Hearing. The Plan Administrator shall, in addition to any powers and authority specifically set forth in other provisions of the Plan, be empowered to (i) effect all actions and execute all agreements, instruments and other documents necessary to perform his duties under the Plan, (ii) establish, as necessary, disbursement accounts for the deposit and distribution of the GUC Distribution Account; (iii) make Distributions in accordance with the Plan, (iv) object to Claims, as appropriate; (v) employ and compensate professionals to represent it with respect to his responsibilities, and (vi) exercise such other powers as may be vested in the Plan Administrator by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Plan Administrator to be necessary and proper to implement the provisions hereof. The Plan Administrator may take any and all actions which he deems reasonably necessary or appropriate to defend against any Claim, including, without limitation, the right to: (a) exercise any and all judgment and discretion with respect to the manner in which to defend against or settle any Claim, including, without limitation, the retention of professionals, experts and consultants; and (b) enter into a settlement agreement or agreements, provided that such settlement is entered into by the Plan Administrator in good faith; and provided, however, that, until MidCap Funding's Allowed Claim is paid in full, the Debtors' cash collections shall be swept daily (as pursuant to prepetition practice) with MidCap Funding remitting cash collections in accordance with the budget attached to the Final Cash Collateral Order.

**D.**     **Substantive Consolidation of the Debtors' Estates**

The Plan is premised upon substantively consolidating each of the Debtors as set forth in Article IX of the Plan for the limited purposes of confirming and consummating the Plan and will have no effect whatsoever on the disputes among the Debtors, Sequoia, Essex Capital and McKesson (and, to the extent applicable, the Committee), raised in the Adversary Proceeding.

There is no express statutory authority for substantive consolidation; rather, substantive consolidation exists as an equitable remedy. *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005). The Bankruptcy Court's ability to order substantive consolidation derives from its general equitable powers under Section 105(a) of the Bankruptcy Code, which provides that the Bankruptcy Court may issue orders necessary to carry out the provisions of the Bankruptcy Code. *In re DRW Property Co.* 82, 54 BR. 489, 494 (Bankr. N.D. Tex. 1985). Some courts have also found authority for substantive consolidation in Section 1123(a)(5)(C) of the Bankruptcy

Code. Section 1123(a)(5)(C) of the Bankruptcy Code provides in part, "a plan [of reorganization] shall provide adequate means for the plan's implementation, such as merger or consolidation of the debtor with one or more persons." *See, e.g., In re Stone & Webster, Inc.*, 286 BR. 532, 541 (Bankr. D. Del. 2002) ("Courts have held that [Section 1123(a)(5)(C)] indicates Congress' intent that a chapter 11 debtor may merge or consolidate with other entities, including other debtors, as part of the reorganization process … substantive consolidation is expressly authorized by … § 1123(a)(5)(C)"). There are, however, no statutorily prescribed standards for court approval of substantive consolidation. Instead, courts apply certain judicially-developed standards to determine the appropriateness of substantive consolidation. *See e.g. In re New Century TRS Holding, Inc.*, 390 BR. 140, 160 (Bankr. D. Del. 2008) (discussing and applying the Third Circuit's *Owens Corning* test).

The Debtors believe that substantive consolidation is warranted for purposes of this Plan.[5] The recoveries for unsecured creditors in these Chapter 11 Cases will ultimately derive from a single source: the GUC Distribution Account. Furthermore, the substantive consolidation of the Debtors will expedite the conclusion of the Chapter 11 Cases.

The Debtors believe that the substantive consolidation requested in the Plan is legally justified under Section 1123(a)(5) of the Bankruptcy Code and prevailing case law. *See* footnote 5 below. Moreover, considering the potential impact of substantive consolidation described above, the Debtors believe it is in the best interest of the Debtors' estates and will promote a more expeditious and streamlined distribution and recovery process for all creditors. The proposed substantive consolidation will not affect any liens or other security interests held by the secured creditors (as the Debtors have each pledged their respective assets to the respective secured creditors).

The Plan shall serve as a motion seeking entry of an order substantively consolidating the Chapter 11 Cases as described in the Plan. Unless an objection to substantive consolidation is made in writing by any Creditor affected by the Plan as provided therein on or before the Plan Objection Deadline, the substantive consolidation order (which order may be the Confirmation Order) may be entered by the Bankruptcy Court. In the event any such objections are timely filed, a hearing with respect thereto shall be scheduled by the Bankruptcy Court, which hearing may, but need not, coincide with the Confirmation Hearing.

### E.    Means for Implementation of the Plan

In addition to the provisions set forth elsewhere in the Plan, the following shall constitute the means for implementation of the Plan:

### 1.    Pooled Rights and Distributions

a. Pooling. All of the respective rights of Essex Capital, Sequoia, and the Committee (on behalf of the Holders of General Unsecured Claims) shall be pooled into the Pooled Rights, with

---

[5] Nothing herein is an admission by the Debtors that substantive consolidation is warranted outside of the Plan.

each party sharing in the rights, assets and recoveries related thereto as set forth in the Plan.

b. <u>DME Sales</u>. (a) Essex Capital shall be deemed to have conceded, conveyed and/or released to the Estates all of Essex Capital's claims and/or rights of ownership in the DME or in any proceeds of the DME, (b) the Estates shall be deemed to have ownership in all of the DME possessed or controlled by the Estates and all proceeds from the sale of any DME shall be deposited into the Pooled Account.

c. <u>Non-DME Sales</u>. The Estates shall be deemed to have all rights to sell or convey all non-DME assets of the Estates, and all proceeds from the sale of any Non-DME Assets shall be deposited into the Pooled Account.

d. <u>Distributions for Pooled Rights</u>.  On account of the Pooled Rights, and as a resolution of the respective rights and claims of Essex Capital, Sequoia and the Holders of General Unsecured Claims, the Plan effectuates a sharing arrangement.  The Plan provides that the five percent proceeds from the DME Sales and Non-DME Sales shall be collected together (the Collected Amounts) and paid among the parties as set forth herein. All Collected Amounts shall be deposited into the Pooled Account, from which five percent (5%) (the GUC Distribution Portion) shall be transferred to the GUC Distribution Account to be distributed, *pro rata*, to the Holders of General Unsecured Claims.  The remaining balance of the Pooled Account shall be distributed between Sequoia and Essex Capital as set forth in their respective treatment sections herein.

e. <u>Releases</u>.  In consideration of this pooling and sharing agreement, upon the Effective Date, except as to the rights benefits and obligations arising from this Plan, in full and final satisfaction of any and all claims which the Releasing Parties have or may possess against any Released Party, the Releasing Parties shall be deemed to hereby release and discharge the Released Parties from any and all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contacts, controversies, agreements, promises, variances, trespasses, damages, judgments, awards, executions, Claims and demands whatsoever, and whether based upon federal, state or local statutory or common law or any other rule, law or regulation. The foregoing release includes both known and unknown claims, that have been, or could have been asserted in any forum by the Releasing Parties, any party

23

claiming derivatively through the Releasing Parties, which the Releasing Parties ever had or now have from the beginning of time through and including the Effective Date. Expressly excluded from this release are any Claims relating to or arising out of the enforcement of any provision of this Agreement. These releases shall be (a) full and final; (b) be of the broadest possible nature permitted by law; and (iii) cover any and all claims asserted and/or which could have been asserted in connection with the Bankruptcy Case and/or the Adversary Proceeding.  For the avoidance of doubt, this Plan does not effectuate any waiver or release of any party's rights or claims against McKesson.

f.  Covenants Not to Sue. Upon the Effective Date, the Releasing Parties, on behalf of themselves and on behalf of their respective professionals, affiliates, agents, representatives and assigns, promise not to sue or proceed in any manner in any proceeding, whether at law or in equity, to solicit others to institute any such actions or proceedings, against the Released Parties because of or arising out of any event or transaction related to the Bankruptcy Case, the Adversary Proceeding, or any other event or occurrence arising prior to the Effective Date. For avoidance of doubt, the provisions of this section shall not apply with regard to actions to enforce the obligations of this Plan.

## 2.      Funding of the Pooled Account

The Collected Amounts, including from DME Sales and Non-DME Sales, but excluding proceeds of Avoidance Actions and any unencumbered assets, will be deposited into the Pooled Account for the benefit of Sequoia, Essex Capital and Holders of General Unsecured Claims pursuant to the sharing agreement set forth in this Plan.

## 3.      Funding of the GUC Distribution Account

Within ten (10) days of the funding of the Pooled Account, the GUC Distribution Portion shall be transferred from the Pooled Account and deposited into the GUC Distribution Account for the benefit of Holders of Claims of Class 6.

## 4.      Funding of Other Liabilities

The Debtors and the Debtors' Estates shall pay from the proceeds of the sale of the Debtors' assets, (i) the wind-down costs of the Estates associated with fixing claims and making Distributions to Creditors, (ii) all Allowed Administrative Expense Claims through confirmation of this Plan, including Allowed Claims pursuant to Section 503(b)(9) of the Bankruptcy Code; and (iii) all Allowed Priority Claims. The Debtors believe that there are no outstanding

Administrative Expense Claims or Priority Claims. All ongoing payments shall be made in accordance with the Budget attached to the Final Cash Collateral Order. The funds in the GUC Distribution Account shall not be available to satisfy costs or expenses in the foregoing sentence and any shortfall must be satisfied first by the Debtors' Estates.

**F.**   **Injunction**

All injunctions or stays provided for in the Chapter 11 Cases under Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date. Except as otherwise expressly provided in the Plan or to the extent necessary to enforce the terms and conditions of the Plan, the Confirmation Order or a separate Order of the Bankruptcy Court, all Entities who have held, hold, or may hold Claims against or Equity Interest in the Debtors, are permanently enjoined, on and after the Confirmation Date, from (A) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Equity Interest, (B) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or Order against the Debtors on account of any such Claim or Equity Interest, (C) creating, perfecting or enforcing any encumbrance of any kind against the Debtors or against the property or interests in property of the Debtors on account of any such Claim or Equity Interest, and (D) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors or against the property or interests in property of the Debtors on account of any such Claim or Equity Interest.

**G.**   **Exculpation**

The Debtors, the Committee and the Plan Administrator and their respective members, managers, partners, officers, directors, employees and agents (including any attorneys and financial advisors retained by such Persons) shall have no liability to any Holder of any Claim or Equity Interest for any act or omission in connection with, or arising out of, the Chapter 11 Cases, the Plan, the Disclosure Statement, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence as determined by a Final Order of the Bankruptcy Court and, in all respects, shall be entitled to rely on the advice of counsel with respect to their duties and responsibilities under this Plan.

**H.**   **Releases**

**1.**   **Releases by the Debtors**

For good and valuable consideration, the adequacy of which is hereby confirmed, upon the Effective Date, the Debtors and their Estates will be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Bankruptcy Cases, the Plan, or the Disclosure

Statement, that could have been asserted at any time, past, present, or future, by or on behalf of the Debtors, or their Estates, against (a) each director, officer or employee employed by or serving the Debtors on and after the Petition Date, in its capacity as such, (b) financial advisor, restructuring advisor or attorney of the Debtors, in its capacity as such employed by or serving on and after the Petition Date; (c) Sequoia, and each financial advisor, restructuring advisor, and attorney for Sequoia; (d) Essex Capital, and each financial advisor, restructuring advisor, and attorney for Essex Capital, (e) MidCap Funding, and each financial advisor, restructuring advisor, and attorney for MidCap Funding, and (f) the Committee, and each member, financial advisor, restructuring advisor, and attorney of the Committee, in its capacity as such; provided, however, that the foregoing shall not affect the liability or release of any Person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted fraud, willful misconduct, gross negligence, bad faith, self-dealing or breach of the duty of loyalty; and shall not be a waiver of any defense, offset or objection to any Claim filed against the Debtors and their Estates by any Person.

## 2. Releases among the Releasing Parties

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE, IN CONSIDERATION FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASING PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE RELEASING PARTIES, TO THE MAXIMUM EXTENT PERMISSIBLE UNDER APPLICABLE LAW, DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH OF THE RELEASED PARTIES (AND EACH OF THE RELEASED PARTIES SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, LIABILITIES WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, THE TRANSACTIONS CONTEMPLATED BY THE PLAN, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY OF THE OTHER RELEASING PARTIES, THE RESTRUCTURING OF CLAIMS AND EQUITY INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, INSTRUMENTS, OR OTHER DOCUMENTS RELATED TO THE BANKRUPTCY CASES, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN EQUITY INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE RELEASING PARTIES; PROVIDED, HOWEVER, THE FOREGOING SHALL NOT AFFECT THE LIABILITY OF ANY PERSON THAT OTHERWISE WOULD RESULT FROM ANY SUCH ACT OR OMISSION TO THE EXTENT SUCH ACT OR OMISSION IS DETERMINED BY A FINAL ORDER TO HAVE CONSTITUTED FRAUD, WILLFUL MISCONDUCT, GROSS NEGLIGENCE, BAD FAITH, SELF-

DEALING OR BREACH OF DUTY OF LOYALTY; PROVIDED FURTHER, HOWEVER, THAT, EXCEPT WITH REGARD TO MIDCAP FUNDING, THE FOREGOING SHALL NOT BE A WAIVER OF ANY DEFENSE, OFFSET OR OBJECTION TO ANY CLAIM FILED AGAINST THE RELEASING PARTIES BY ANY PERSON.

**I.    Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, all Executory Contracts and unexpired leases not assumed before the Confirmation Date will be deemed rejected. The Confirmation Order shall constitute an order approving such rejection as of the Effective Date. If the rejection by the Debtors, pursuant to the Plan or otherwise, of an Executory Contract (which includes an unexpired lease) gives rise to a Claim, a Proof of Claim must be filed with the United States Bankruptcy Court, 402 East State Street, Trenton, New Jersey 08608 and served upon the Debtors' counsel or as otherwise may be provided in the Confirmation Order, by no later than thirty (30) days after the later of (i) notice of entry of the Confirmation Order, and (ii) other notice that the Executory Contract or unexpired lease has been rejected. Any Proofs of Claim not filed and served within such time periods will be forever barred from assertion against the Debtors and their estates. Unless otherwise Ordered by the Bankruptcy Court, all Claims arising from the rejection of Executory Contracts and unexpired leases shall be treated as Unsecured Claims under the Plan.

**J.    Conditions Precedent to the Effective Date**

The Plan shall not become effective unless and until the following conditions shall have been satisfied or waived:

      i.      The Confirmation Order shall have become a Final Order. If the Confirmation Order is entered but is not a Final Order, this condition to the Effective Date may only be waived by written agreement of the Debtors, the Committee, Essex Capital and Sequoia.

      ii.      The Plan Administrator shall be duly appointed, qualified and acting in that capacity.

      iii.      The Adversary Proceeding has been settled or adjudicated pursuant to Court Order.

      iv.      The Confirmation Order shall be in a form reasonably acceptable to the Debtors, Committee, Essex Capital and Sequoia.

**K.**     **Retention of Jurisdiction**

The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, Sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the purposes set forth in Article XIII of the Plan.

**L.**     **Dissolution of Debtors**

On the Effective Date, the Debtors shall be deemed dissolved under applicable law without the need for filing any documents.

## VII.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following discussion is a summary of certain U.S. federal income tax consequences of the Plan to the Debtors and to Holders of Claims and Equity Interests. This discussion is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof.

Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims, each Holder's status and method of accounting and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are uncertain. No legal opinions have been requested from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below. Further, legislative, judicial or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtors and the Holders of Claims and Equity Interests.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or the Holders of Claims or Equity Interests in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, insurance companies, financial institutions, real estate investment trusts, tax-exempt organizations, small business investment companies, regulated investment companies, foreign taxpayers, persons whose functional currency is not the U.S. dollar, persons subject to the alternative minimum tax, and persons holding Claims or Interests as part of a "straddle," "hedge," "constructive sale" or "conversion transaction" with other investments). This discussion does not address the tax consequences to Holders of Claims who did not acquire such Claims at the issue price on original issue. No aspect of foreign, state, local or estate and gift taxation is addressed.

EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX CONSEQUENCES OF THE PLAN.

## A.    Tax Consequences to the Debtors

Pursuant to the Tax Code and subject to certain exceptions, a taxpayer generally must recognize income from the cancellation of indebtedness ("COD Income") to the extent that such taxpayer's indebtedness is discharged for an amount less than the indebtedness' adjusted issue price determined in the manner described below. Generally, the amount of COD Income, subject to certain statutory and judicial exceptions, is the excess of (i) the adjusted issue price of the discharged indebtedness less (ii) the sum of the fair market value (determined at the date of the exchange) of the consideration, if any, given in exchange for such discharged indebtedness.

Section 108(a)(l)(A) of the Tax Code provides an exception to the recognition of COD Income where a taxpayer discharging indebtedness is under the jurisdiction of a court in a case under title 11 of the Bankruptcy Code and where the discharge is granted, or is effected pursuant to a plan approved, by a U.S. Bankruptcy Court (the "Bankruptcy Exception"). Under the Bankruptcy Exception, instead of recognizing COD Income, the taxpayer is required, pursuant to Section 108(b) to reduce certain of that taxpayer's tax attributes to the extent of the amount of COD Income. The attributes of the taxpayer generally are reduced in the following order: net operating losses, general business and minimum tax credit carryforwards, capital loss carryforwards, the basis of the taxpayer's assets and, finally, foreign tax credit carryforwards (collectively, "Tax Attributes"). If the amount of COD Income exceeds the amount of Tax Attributes available to be reduced, the excess still is excluded from income. Pursuant to Section 108(b)(4)(A), the reduction of Tax Attributes does not occur until the end of the taxable year after such Tax Attributes have been applied to determine the tax in the year of discharge or, in the case of asset basis reduction, the first day of the taxable year following the taxable year in which the COD Income is realized. Section l08(e)(2) provides a further exception to the recognition of COD Income upon the discharge of debt, providing that a taxpayer will not recognize COD Income to the extent that the taxpayer's satisfaction of the debt would have given rise to a deduction for United States federal income tax purposes.

## B.    Tax Consequences to Creditors

### 1.    Holders of Claims

Generally, a Holder of a Claim should in most, but not all circumstances, recognize gain or loss equal to the difference between the "amount realized" by such Holder in exchange for its Claim and such Holder's adjusted tax basis in the Claim. The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under a plan of reorganization in respect of a Holder's Claim. The tax basis of a Holder in a Claim will generally be equal to the Holder's cost. To the extent applicable, the character of any recognized gain or loss (*e.g.*, ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the Holder, the nature of the Claim in the Holder's hands, the purpose and circumstances of its acquisition, the Holder's holding period of the Claim, and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. Generally, if the Claim is a capital asset in the Holder's hands, any gain or loss realized generally will be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the Holder has held such Claim for more than one year.

A Holder who received Cash (or potentially other consideration) in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for United States federal income tax purposes as interest, regardless of whether such Holder realizes an overall gain or loss as a result of surrendering its Claim. A Holder who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Holder realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim.

## 2.    Non-United States Persons

A Holder of a Claim that is a non-United States Person generally will not be subject to United States federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Plan, unless (i) such Holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for United States federal income tax purposes, or (ii) if such Holder is an individual, such Holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

## C.    Importance of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## VIII.
## CERTAIN RISK FACTORS TO BE CONSIDERED

Prior to voting on the Plan, each holder of a Claim entitled to vote should consider carefully the risk factors described below, as well as all of the information contained in this Disclosure Statement and the Plan, including the Exhibits hereto. These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.

A.      **Risk of Non-Confirmation of Plan**

Although the Debtors believe the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate a re-solicitation of votes.

B.      **Delays of Confirmation and/or Effective Date**

Any delay in confirmation and effectiveness of the Plan could result in, among other things, increased Administrative Expense Claims. These or any other negative effects of delays in confirmation or effectiveness of the Plan could endanger the ultimate approval of the Plan by the Bankruptcy Court.

C.      **Alternative Plan**

If the Plan is not confirmed, the Debtors, or any other party in interest could attempt to formulate a different plan. However, the additional costs, all of which would constitute Administrative Expense Claims may be so significant that one or more parties in interest could request that the Cases be converted to Chapter 7. Accordingly, the Debtors believe that the Plan enables creditors to realize the best return under the circumstances.

Dated:  May 4, 2015                           PASSAIC HEALTHCARE SERVICES, LLC
                                              d/b/a ALLCARE MEDICAL, *et al.,*


                                        By: _/s/ Winthrop Hayes_____
                                              Winthrop Hayes
                                              President


4826-6593-7955, v. 1