**TRENK, DiPASQUALE,
DELLA FERA & SODONO, P.C.**
347 Mt. Pleasant Avenue, Suite 300
West Orange, NJ 07052
(973) 243-8600
Joseph J. DiPasquale, Esq.
Thomas M. Walsh, Esq.
*Counsel to Chapter 11 Debtors and Debtors-in-Possession*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| PASSAIC HEALTHCARE SERVICES, LLC d/b/a ALLCARE MEDICAL, *et al.*, | Case No. 14-36129 (CMG) |
| Debtors. | (Jointly Administered) |

**VERIFIED APPLICATION IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO (i) SELL THEIR INVENTORY AND EQUIPMENT FREE AND CLEAR OF ALL LIENS AND ENCUMBRANCES, AND (ii) APPROVING SALE AND AUCTION PROCEDURES IN CONNECTION THEREWITH INCLUDING, WITHOUT LIMITATION, STALKING HORSE BIDDER'S EXPENSE REIMBURSEMENT**

TO:   HONORABLE CHRISTINE M. GRAVELLE
UNITED STATES BANKRUPTCY JUDGE

Passaic Healthcare Services, LLC d/b/a Allcare Medical ("**PHS**"), Galloping Hill Surgical LLC d/b/a Allcare Medical ("**Galloping Hill**") and Allcare Medical SNJ LLC d/b/a Allcare Medical ("**Allcare Medical SNJ**" and, collectively with Galloping Hill, the "**Subsidiary Debtors**"), the within debtors and debtors-in-possession (collectively the "**Debtors**"), by and through their undersigned counsel, respectfully submit the within application for an order approving, *inter alia*, the sale of Debtors' inventory and equipment and bidding procedures related thereto (the "**Application**"). In support of the Application, the Debtors respectfully

represent as follows:

## JURISDICTION AND VENUE

1. This Application is submitted in support of Debtors' Motion for entry of an Order (a) authorizing Debtors to solicit bids for the sale of certain inventory and equipment owned by the Debtors; (b) approving competitive bidding procedures related thereto; (c) scheduling (i) an auction (the "**Auction**") with respect to the sale of the inventory and equipment and (ii) a hearing date to approve the sale (the "**Sale Hearing**"); (d) approving the form, manner and sufficiency of notice of the Auction and the Sale Hearing; and (e) approving the sale of the inventory and equipment to a qualified bidder at the Auction determined by the Debtors to be the highest and best offer pursuant to 11 U.S.C. § 363 and Rule 6004 of the Federal Rules of Bankruptcy Procedure.

2. This Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334 and the District Court General Order of Reference dated July 23, 1984. This is a core proceeding under 28 U.S.C. § 157(b).

3. Venue of this case and the Motion in this judicial district is proper under 28 U.S.C. §§ 1408 and 1409.

4. The statutory bases for the relief sought by the Motion are sections 105(a), 363(b), (f), (k) and (m), and 541(a) of the Bankruptcy Code.

## BACKGROUND

5. On December 31, 2014, PHS filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey.

6. On January 6, 2015, the Subsidiary Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of

New Jersey.

7. The Debtors continue to operate their business and assets as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Committee was formed on January 14, 2015. No trustee or examiner has been appointed in the Chapter 11 cases.

8. On April 30, 2015, the Debtors' filed a Plan of Orderly Liquidation.

9. On May 4, 2015, the Debtors' filed a Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for Plan of Orderly Liquidation.

10. The Debtors seek to sell, assign, transfer, convey and deliver to the Proposed Buyer all of their collective right, title and interest in the following:

(a) all inventory of durable medical equipment, respiratory therapy equipment and other items of inventory held by Debtors as of the Closing Date (the "**Inventory**"); and

(b) all home medical equipment, respiratory therapy equipment and other durable medical equipment returned to the Debtors from a patient's home ("**Returned Equipment**"), and all associated warranties and service agreements or rights related thereto (the Inventory and Returned Equipment shall collectively be referred to herein as the "**Transferred Assets**").

**Essex Adversary Proceeding**

11. On January 20, 2015, Essex commenced an adversary proceeding in the Bankruptcy Cases (the "**Adversary Proceeding**") captioned as <u>Essex Capital Corporation and Cornerstone Essex Leasing Co., LLC v. Passaic Healthcare Services, LLC, d/b/a Allcare Medical SNJ, LLC, d/b/a Allcare Medical, McKesson Medical-Surgical Minnesota Supply, Inc. and Sequoia Healthcare Services, LLC</u>, Adv. Pro. No. 15-1047 (CMG).

12. On February 9, 2015, Essex filed a First Amended Complaint (I) To Determine Extent Of Ownership Interest Of Essex Capital Corporation And Cornerstone Essex Leasing Co., LLC In Certain Equipment Leased To Debtor And (II) For Declaration That Equipment Leases Are True Leases And Not Disguised Secured Transactions (the "**Complaint**") in the Adversary Proceeding.

13. In the Complaint, Essex asserts that (i) PHS entered into eleven (11) separate transactions whereby Essex acquired durable medical equipment and leased such equipment to PHS; (ii) Essex retained title to such equipment; (iii) the leases between Essex and PHS were "true leases" and not disguised financing transactions; (iv) the leased equipment was not encumbered by the security interests or liens of PHS' secured creditors, to wit, McKesson Medical-Surgical Minnesota Supply, Inc., ("**McKesson**") and/or Sequoia Healthcare Services, LLC ("**Sequoia**").

**Terms of Sale**

14. After careful consideration of all of the facts including, but not limited to, the Adversary Proceeding, the Debtors have entered into an asset purchase agreement with MedStar Surgical & Breathing Equipment, Inc. ("**Medstar**" or "**Proposed Buyer**") to purchase the Transferred Assets.

15. Subject to the terms of the Sale Settlement (discussed herein), the Transferred Assets will be sold to the Proposed Buyer free and clear of all existing liens, claims and encumbrances pursuant to 11 U.S.C. § 363 for:

   i. the sum of Two Hundred Seven Thousand Two Hundred Dollars ($207,200) for the Inventory; provided, however, that to the extent that the value of the Inventory, calculated using the quantity of Inventory as of the Closing Date and Per Unit Value, is more/less than One Million Thirty-Six Thousand Dollars ($1,036,000), the amount payable by the Proposed Buyer as payment for the Inventory shall be increased/reduced on a proportionate basis based on the dollar amount of such windfall/shortfall; and

   ii. the Proposed Buyer shall pay to the Debtors, within fifteen (15) days after the end of each calendar month beginning with the month during which the Closing Date occurs (or, if the Closing Date is the last day of a month, beginning with the immediately succeeding month), a dollar amount equal to twenty percent (20%) of the Per Unit Value of those items of Returned Equipment that were delivered to the Proposed Buyer during the immediately preceding month.

16. The terms of the sale are as follows:

   i. The Transferred Assets are being sold "**AS IS, WHERE IS**" with no representations of any kind;

   ii. Closing on the sale of the Transferred Assets will occur within five (5) days after the conditions to Closing are satisfied. The parties' target Closing Date is on or before August 7, 2015;

   iii. The Debtors are solely responsible for the payment of all taxes, if any;

    iv. The Proposed Buyer will not assume, agree to pay, discharge or satisfy any debt, liability or obligation of the Sellers; and

    v. At the Closing, the Debtors shall execute and deliver to the Proposed Buyer the Bill of Sale.

17. With the exception of the Adversary Proceeding, there are no pending proceedings, or to the Debtors' knowledge, threatened, seeking to prevent, hinder, delay or challenge the transactions in the Agreement.

**The Sale Settlement**

18. Contemporaneously herewith, the Debtors are filing an application seeking to approve a Settlement Agreement between the Debtors, Essex, and Sequoia, through which, *inter alia*, Essex is providing the Debtors with authority to sell certain DME owned by Essex and leased to the Debtors (the "Sale Settlement Agreement").

19. The Debtors, Sequoia, Essex and the Official Committee of Unsecured Creditors consent to the sale and acknowledge that all valid liens, claims, encumbrances, or interests shall attach to the proceeds of the sale, subject to and consistent with the terms of the Sale Settlement Agreement and as set forth in the proposed sale order submitted herewith. Essex and Sequoia have indicated that they will oppose approval of the sale if the Sale Settlement Agreement is not approved by the Court, or if the terms of the order approving the sale are not consistent with the terms of the Sale Settlement Agreement.

## RELIEF REQUESTED AND BIDDING PROCEDURES

20. In their sound business judgment, the Debtors have decided to sell the Transferred Assets in furtherance of their liquidation efforts. Since filing for Chapter 11, Debtors have been actively and diligently marketing the Transferred Assets.

21. The Debtors negotiated and finalized with MedStar the terms of the Transferred Assets for the amount set forth in the Asset Purchase Agreement (the "**MedStar Sale Agreement**"). A copy of the MedStar Sale Agreement is annexed hereto as **Exhibit "A."** In accordance with section 363(b)(1) of the Bankruptcy Code, and F.R.B.P. 6004(f)(1), the Debtors seek to sell the Transferred Assets to MedStar under the terms of the MedStar Sale Agreement, subject to higher and better bids, in order to receive the highest and best price for the Transferred Assets.

22. Subject to this Court's imprimatur, the Debtors' Chapter 11 counsel ("**Debtors' Counsel**") will auction the Transferred Assets, subject to the MedStar Sale Agreement and to higher and better offers pursuant to an auction to be conducted at the Sale Hearing (as defined below), at 10:00 a.m. at the Clarkson S. Fisher U.S. Courthouse, 402 East State Street, Trenton, New Jersey 08608 (the "**Auction**").

23. The Debtors request approval of the following bidding procedures, structured with the objective of obtaining the highest and best offers for the Transferred Assets:

> (a) Any bid shall be a bid to purchase the Transferred Assets, "**AS IS, WHERE IS**," free and clear of all liens, encumbrances, purchase contract, options, interests and claims, whether known or unknown, choate or inchoate, pursuant to section 363(f) of the United States Bankruptcy Code (the "Bankruptcy Code").
>
> (b) In order to be a Qualified Bidder, a bidder (other than MedStar who shall be deemed a Qualified Bidder) must (i) submit a written bid to the Debtors' Counsel, with a copy to Essex's counsel (the "**Bid**"); and (ii) deliver an earnest money deposit to Debtors' Counsel for ten percent (10%) of the total proposed purchase price (the "**Deposit**") in the form of a certified check or wire transfer payable to the trust account of Debtors' counsel (the "**Trenk DiPasquale Trust Account**") **no later than three (3) business days before the Auction** (the "**Bid Deadline**"). A qualified bid must also identify the bidder and contain such documents and information so as to establish the bidder's financial ability to close and to fund the purchase price (a "**Qualified Bid**"). The Successful Bidder (as defined herein below) will execute the Agreement provided by Debtors' counsel to Qualified Bidders (the "**Agreement**").

7

(c) The Deposit will be forfeited as liquidated damages and the Successful Bidder (defined below) held liable for compensatory damages if the Successful Bidder fails to close by reason of its breach of the Agreement.

(d) Bids may not be subject to financing, due diligence, or any other contingency except the entry of an Order of this Court approving the sale pursuant to 11 U.S.C. § 363(b). Bids including such terms will not be accepted.

(e) If a Qualified Bid is received by the Bid Deadline by Debtors' Counsel, with a copy to Essex's counsel, at the addresses for submission of bids set forth herein below, the Auction will be conducted in Court, or at such other place as shall be determined, **no later than one (1) business day before the Sale Hearing**. If no Qualified Bid is received, the sale may proceed without the Auction.

(f) Bidders who have submitted a Qualified Bid that does not exceed the purchase price set forth in the MedStar Sale Agreement of twenty percent (20%) of the Per Unit Value for the Inventory and Returned Equipment may improve their bids at the Auction at an increment of at least three percent (3%) more than such purchase price, and subsequent increases of one percent (1%) (or such other amount as Debtors, in consultation with Essex's counsel, Sequoia's counsel and Committee counsel, shall determine at the Auction). In other words, the initial overbid must be at least twenty-three percent (23%) of the Per Unit Value. The bidding shall be continuous and competitive and shall not end until all bidders have submitted their last and best offers.

(g) At the conclusion of the Auction, if any, Debtors' Counsel, after consultation with Essex's counsel, will announce the highest and best bid (the "**Successful Bidder**") and the second highest and best bid (the "**Back-Up Bidder**"). If the Successful Bidder is other than MedStar, the Successful Bidder shall execute the Agreement immediately following the Auction and supplement its deposit by wire transfer or other immediately available funds within one (1) business day so that, to the extent necessary, such deposit equals ten percent (10%) of the highest and best bid. If, for any reason, the Successful Bidder fails to consummate the purchase of the Transferred Assets, (i) the Back-Up Bidder will be deemed to have submitted the highest and best bid and by submitting a bid agrees that its bid shall remain open until the close, or failure to close, of the transaction with the Successful Bidder (the "**Commitment**"), and (ii) Debtors shall be authorized to effect the sale of the Transferred Assets to the Back-Up Bidder as soon as is commercially reasonable without further Order of the Court. Debtors' Counsel shall retain the Back-Up Bidder's deposit in a non-interest bearing trust account until the sale to the Successful Bidder closes, at which time the deposit (plus accrued interest, if any) shall be returned to the Back-Up Bidder. If the Successful Bidder fails to close, the Back-Up Bidder's deposit shall be treated in the manner described in sub-paragraph (j) below.

(h) A hearing to confirm the results of the Auction, if any, and/or to approve the sale of the Transferred Assets will be held before The Honorable Christine M. Gravelle, United States Bankruptcy Judge, at the Clarkson S. Fisher U.S. Courthouse, 402 East State Street, Trenton, New Jersey 08608, **no later than August 4, 2015, at 10:00 a.m. (E.S.T.)** (the "**Sale Hearing**").

(i) Except as otherwise agreed in writing, all deposits shall be held by Debtors' Counsel in a non-interest-bearing bank account. Within two (2) business days after the closing of the sale of the Transferred Assets, Deposits shall be returned to all bidders except the Successful Bidder. The deposit (plus accrued interest, if any) of the Successful Bidder or the Back-Up Bidder, as applicable, shall be applied to the purchase price at closing. The closing shall occur **on or before August 7, 2015**.

(j) Debtors, after consultation with Essex, reserve the right to: (i) impose additional or different terms and conditions at or before the Auction, (ii) extend the deadlines set forth in the Sale Procedures and/or adjourn the Auction and/or the Sale Hearing in open court without further notice; and (iii) withdraw any or all of the Transferred Assets from the Auction. The terms of the sale are governed as to MedStar by the MedStar Sale Agreement and to the extent it is not provided for therein, MedStar does not have to consent in any situation, whether or not it is reasonable.

(k) Reservation of Rights: Debtors, after consultation with Essex, may at any time, in its sole discretion, reject any and all Bids which are not Qualified Bids.

(l) Disclaimer: Each Bidder, by submitting a Bid for the Transferred Assets, shall be deemed to acknowledge and represent:

- that it is bound by the Bidding Procedures contained herein;

- that it had an opportunity to inspect and examine the Transferred Assets and to review all pertinent documents and information with respect to the Transferred Assets prior to making its offer and that it relied solely on that review and upon its own investigation and inspection of the Transferred Assets in making its Bid; and

- that it is not relying upon any written or oral statements, representations or warranties of the Debtors, or the Debtors' agents or representatives.

(m) Qualified Bids Open and Irrevocable: All Bids (including Qualified Bids and subsequent written and/or oral bids) shall remain open and irrevocable until the closing which shall occur on or before **August 7, 2015**. In the event of a default by the Successful Bidder and by the Back-Up Bidder, Debtors reserve the right to accept any Bid that is open and irrevocable and to schedule a closing with such Bidder on or before **August 7, 2015**.

(n) Bids must be submitted to the following persons so as to be received by the Bid Deadline:

|  |  |
|---|---|
| To Debtors: | Thomas M. Walsh, Esq.<br>Trenk, DiPasquale, Della Fera & Sodono, P.C.<br>347 Mt. Pleasant Avenue, Suite 300<br>West Orange, NJ 07052<br>Email: twalsh@trenklawfirm.com |
| With a copy to: | |
| Essex Capital Corporation: | Curtis M. Plaza, Esq.<br>Riker Danzig Scherer Hyland & Perretti LLP<br>Headquarters Plaza, One Speedwell Avenue<br>Morristown, NJ 07962<br>Email: cplaza@riker.com |

24. Debtors believe that establishing the procedures described above for bidding on the Transferred Assets will allow them to promptly review, analyze and compare all bids received and determine if a bid or bids are in the best interests of the bankruptcy estates of the Debtors. Debtors propose that within one (1) business day after the conclusion of the Auction, they will cause their counsel to file with Court a supplement outlining the identity of the Successful Bidder of the Transferred Assets and the purchase price received therefore.

25. In addition to the foregoing requirements, the Debtors request authority to provide certain protections to MedStar. Specifically, the Debtors will provide MedStar with an expense reimbursement in an amount equal to the documented actual fees, costs, and expenses (including, without limitation, reasonable professional fees and expenses), that MedStar incurred in connection with the negotiation, due diligence, preparation, execution and delivery of the MedStar Sale Agreement and any other related contracts or documents, up to a maximum amount of $25,000 (the "**Expense Reimbursement**"). There is no separate break-up fee.

26. Moreover, Debtors propose that if Debtors become obligated to pay MedStar the Expense Reimbursement, then such obligation shall constitute a superpriority administrative expense under sections 105, 503, and 507 of the Bankruptcy Code, with priority of payment

senior to all other administrative expenses, which shall be paid from the proceeds of the Auction, as set forth in greater detail in the Sale Settlement Agreement, to the extent that one or more Qualified Bidders submit one or more overbids for the Transferred Assets and a transaction is consummated.

## APPLICABLE LEGAL AUTHORITY

### A. The Debtors Should Be Authorized to Sell the Transferred Assets Pursuant to the Procedures Contained Herein Because Debtors are Selling the Transferred Assets to a Good Faith Buyer for a Sound Business Purpose

27. Debtors should be authorized to sell the Transferred Assets to MedStar subject to higher and better offers. Section 363(b) of the Bankruptcy Code governs sales of assets outside the ordinary course of business and provides as follows:

> The [debtor-in-possession], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

11 U.S.C. §363(b)(1); see also Fed. R. Bankr. P. 6004(f)(1) (authorizing sales outside of the ordinary course of business to be conducted privately or by public auction).

28. Although certain of the Transferred Assets are currently owned by Essex, and not by the Debtors' estates, pursuant to the Sale Settlement Agreement, and in exchange for the consideration being given in conjunction with the Sale Settlement Agreement, Essex is conceding, conveying and/or releasing to the Debtors' estates all of Essex's claims and/or rights of ownership in the Transferred Assets that are currently owned by Essex, so that those Transferred Assets may be sold by the Debtors pursuant to this Motion.

(1) Good Faith Buyer Requirement

29. Although the Bankruptcy Code contains no guidance regarding the circumstances under which a sale of assets can be approved (except that notice and a hearing must be provided), the Third Circuit in In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 149-50 (3d Cir.

11

1986) interpreted Section 363(b) to require a finding by the Bankruptcy Court that the purchaser of a debtor's assets is a good faith buyer. The Third Circuit construed the "good faith buyer" standard to mean one who purchases "in good faith" and for "value." Abbotts, 788 F.2d at 147.

### (i) Any and All Potential Bidders will be "Good Faith" Purchasers

30. The Abbotts Dairies court analogized the bona fides of a Section 363(b) purchaser to a buyer at a judicial sale:

> The requirement that a purchaser act in good faith speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

Abbots, 788 F.2d at 147 (quoting In re Rock Industries Machinery Corp., 572 F.2d 1195, 1198 (7th Cir. 1978).

31. Section 363(m) of the Bankruptcy Code provides that a reversal or modification on appeal of an authorized sale of property under section 363(b) of the Bankruptcy Code will not affect the validity of such sale to a good faith purchaser. See 11 U.S.C. § 363(m).

32. Debtors represent that MedStar is unaffiliated with the Debtors, the Debtors' officers, and the Debtors' members. MedStar's stalking horse bid is a product of good faith negotiations between the Debtors and MedStar, and, therefore, MedStar is entitled to the protection of section 363(m) of the Bankruptcy Code upon approval at the Sale Hearing. MedStar also represents that neither it nor its members are related to the Debtors and/or their owners, officers, and members.

33. Any sale under an alternative transaction likewise will be the product of arms-length and good faith negotiations. Any such transaction will be the result of a fair auction process conducted under the supervision of this Court pursuant to the Bidding Procedures Order.

12

The protections of section 363(m) of the Bankruptcy Code therefore should apply with equal force in the event of an alternative transaction.

### (ii) The Transferred Assets Will be Sold for Fair "Value"

34. Courts will only approve section 363(b) sales if the debtor has obtained a fair and reasonable price for the assets. In re Delaware & Hudson Railway Co., 124 B.R. 169, 176 (D. Del. 1991); In re Indus. Valley Refrigeration and Air Conditioning Supplies, Inc., 77 B.R. 15, 20 (Bankr. E.D. Pa. 1987).

35. At the Sale Hearing, Debtors will demonstrate that the Successful Bidder bought the Transferred Assets for "value." At a minimum, because the sale of the Transferred Assets will have been the subject of marketing and higher and better bids at the Auction, Debtors are confident that the Transferred Assets' value will be maximized.

### (2) The Debtors Are Selling the Transferred Assets for a Sound Business Purpose

36. In addition to the Abbotts Dairies requirements, courts consistently require debtors-in-possession to establish a "sound business purpose" to sell any or all of their assets before confirmation of a reorganization plan. In re Lionel Corp. 722 F.2d 1063 (2d Cir. 1983); Delaware & Hudson Railway., 124 B.R. at 175-76; In re Titusville Country Club, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. ED. Pa. 1989); In re Conroe Forge & Manufacturing Corp., 82 B.R. 781, 783-86 (Bankr. W.D. Pa. 1988); Industrial Valley, 77 B.R. at 21. Courts have developed the following non-exclusive list of factors to consider in determining whether a sound business purpose exists:

   a) Sound business reason for the sale;

   b) Accurate and reasonable notice;

   c) Proportionate value of the asset to the estate as a whole (fair and reasonable);

    d) The amount of elapsed time since the filing;

    e) The likelihood that a plan of reorganization will be proposed and confirmed in the near future;

    f) The effect of the proposed disposition on the future plan;

    g) The amount of proceeds to be obtained from the sale versus the appraised value of the property sold; and

    h) Whether the asset is decreasing or increasing in value.

Lionel, 722 F.2d at 1071; Delaware & Hudson Railway, 124 B.R. at 176.

37. Courts have made clear that a debtor's showing of a sound business justification does not have to be unduly exhaustive. Rather, a debtor is "simply required to justify the proposed disposition with sound business reason." In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

38. Primarily, the Debtors' are selling the Transferred Assets for a sound business purpose because they have a sound business reason for the sale. In this case, the Debtors are selling the Transferred Assets because their post-petition business is winding down. Furthermore, the Debtors' Plan calls for liquidation of the business, including all of its assets. The sale of the Transferred Assets will buttress the Debtors' successful liquidation and create a pot for the payment of certain claims.

39. Also, the form and manner of the notice of Motion and the procedures used for soliciting higher and better offers for the Transferred Assets have been submitted for approval by the Court and will ensure that any and all interested parties will receive adequate notice of the Auction. Consideration of those sound business reasons leads to the inescapable conclusion that Debtors should be authorized to sell the Transferred Assets.

**B. The Debtors Should Be Authorized to Sell the Transferred Assets Free and Clear of All Liens Pursuant to Section 363(f) of the Bankruptcy Code**

14

40. Pursuant to section 363(f), the Bankruptcy Code authorizes a debtor-in-possession to sell property of the estate under section 363(b) free and clear of any interest or lien in such property if one of the following five criteria is met:

    a) applicable non-bankruptcy law permits sale of such property free and clear of such interest;

    b) such entity consents;

    c) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    d) such interest is in bona fide dispute; or

    e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

41. The language of section 363(f) is in the disjunctive, so that a sale free and clear of interests can be approved if any one of the aforementioned conditions is satisfied. In re Heine, 141 B.R. 185, 189 (Bankr. D.S.D. 1992); In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988).

42. A sale free and clear of liens, claims, interests, options, and encumbrances is necessary to maximize the value of the Transferred Assets.

43. As is set forth above, simultaneously with the filing of this Motion, the Debtors will be filing a motion to approve the Sale Settlement Agreement, pursuant to which Essex is authorizing the Debtors to sell the Transferred Assets that are owned by Essex. Moreover, pursuant to the Sale Settlement Agreement, the Debtors are acknowledging and agreeing that two-thirds (2/3) of the value obtained from the sale of the Transferred Assets is related to the sale of the Transferred Assets owned by Essex, and, as such, the proceeds from the sale of those assets are to be escrowed by the Debtors' counsel for the benefit of Essex and/or other parties that claim to have a lien on the Transferred Assets, as owned by Essex. Additionally, through

15

the Sale Settlement Agreement, the Debtors are acknowledging and agreeing that the remaining one-third (1/3) of the value obtained from the sale of the Transferred Assets is related to the sale of the Transferred Assets owned by the Subsidiary Debtors, and, as such, the proceeds from the sale of those assets are to be escrowed by the Debtors' counsel for the benefit of Sequoia and/or other parties that claim to have a lien on the Transferred Assets, as owned by the Subsidiary Debtors.

44.    As such, and in accordance with the terms of the Sale Settlement Agreement and the terms of the proposed sale order submitted herewith, Essex consents to the sale of the Transferred Assets and has actively participated in the sale process.

45.    Moreover, Sequoia, as a secured creditor of the Debtors, including the Subsidiary Debtors, also consents to the sale of the Transferred Assets.

46.    The Debtors believe that McKesson will consent to the sale of the Transferred Assets. If McKesson objects to the sale the Debtors shall proceed under 363(f)(4) of the Bankruptcy Code. "The purpose of 11 U.S.C. § 363(f)(4) is to permit property of the estate to be sold free and clear of interests that are disputed by the representative of the estate so that liquidation of the estate's assets need not be delayed while such disputes are being litigated." Moldo v. Clark (In re Clark), 266 B.R. 163, 171 (Bankr. App. 9th Cir. 2001). "This standard does not require the court to resolve the underlying dispute, just to determine its existence." Union Planters Bank, N.A. v. Burns (In re Gaylord Grain LLC), 306 B.R. 624, 627 (Bankr. App. 8th Cir. 2004). Further, the lien need not be the subject of an immediate or concurrent adversary proceeding. Id. Finally, an objective basis for avoiding the liens qualifies as a basis for a bona fide dispute under section 363(f)(4). Id. Here, the Debtors dispute McKesson's alleged lien on the Transferred Assets. Moreover, McKesson does not even assert a lien on the assets of the

Subsidiary Debtors. Thus, the Debtors can sell the Transferred Assets free and clear of McKesson's liens.

### C. The Expense Reimbursement is Justified Under Code Section 105(a)

47. Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." As described above, approval of the Bidding Procedures will greatly assist the Debtors in maximizing the value that they may obtain for the Transferred Assets. Consequently, the Debtors respectfully submit that granting the requested relief is "appropriate" under the circumstances.

48. Bidding incentives encourage a potential purchaser to invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the Chapter 11 process. "Agreements to provide . . . reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers." In re S.N.A. Nut Company, 186 B.R. 98, 101 (Bankr. N.D. Ill. 1995).

49. The test for determining whether a stalking horse bidder can be reimbursed for its expenses, and whether those expenses are entitled to administrative expense status pursuant to section 503 of the Bankruptcy Code, is whether the expense reimbursement is "necessary to preserve the value of the [debtor's] estate." Calpine Corp. v. O'Brien Env. Energy, Inc. (In re O'Brien Env. Energy, Inc.), 181 F.3d 527, 536 (3d Cir. 1999). Thus, to be approved, bidding incentives must provide some benefit to the debtor's estate. Id.

50. The Third Circuit identified at least two instances in which bidding incentives may benefit the estate. First, benefit may be found if "assurance of [expense reimbursement] promoted more competitive bidding, such as by inducing a bid that otherwise would not have

17

been made and without which bidding would have been limited." Id. at 537.  Second, where the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

51. In this case, reimbursing MedStar for its reasonable expenses in connection with its bid for the Transferred Assets significantly benefits the Debtors' estates.  MedStar has expended significant time and effort in performing due diligence in connection with the Transferred Assets and in crafting its bid.  If it knows that another bidder will just wait for it to do the work and then overbid it, MedStar will have no incentive to go ahead with its bid, and no incentive to attend, and bid at, the Auction.  Accordingly, in order to ensure that MedStar submits its bid, and attends and bids at the Auction, it is essential that this Court permit MedStar to be reimbursed for its reasonable expenses.

### D. Request for Waiver of the Fourteen-Day Stay Under Bankruptcy Rule 6004(h)

52. Bankruptcy Rule 6004(h) provides that all orders authorizing the sale of property pursuant to Bankruptcy Code Section 363 are automatically stayed for fourteen (14) days after entry of such order "unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).

53. This Court has approved requests to waive the stay so long as there is a "business need" for same. In re Grand Prix Associates, Inc., No. 09-16545 (DHS), 2009 WL 1850966 at *8 (Bankr. D.N.J. Jun. 26, 2009).

54. In the present matter, waiving the fourteen (14) day stay under Bankruptcy Rule 6004(h) will serve a business need by enabling the Debtors to minimize any costs associated with the proposed Sale by allowing the parties to close the transaction as soon as possible after

entry of the proposed Order. Also, waiver of this stay will ensure the smooth facilitation of the Auction, if any, and Sale.

55. Accordingly, the Debtors request that the Court waive the fourteen (14) day stay set forth in Bankruptcy Rule 6004(h).

### NOTICE, PRIOR REQUEST AND WAIVER OF BRIEF

56. Notice of this Motion has been given to (a) the United States Trustee for the District of New Jersey; (b) all secured creditors; (c) all parties that have requested notice in any of these cases; (d) counsel for the Proposed Buyer; and (e) all entities known to the Debtors to have expressed a *bona fide* interest in the Transferred Assets. The Debtors submit that no other or further notice is required.

57. No previous motion for the relief sought herein has been made to this or to any other court.

58. As no novel issue of law is raised and the relevant authorities relied upon by the Debtors are set forth herein, the Debtors respectfully request that the requirement of D.N.J. LBR 9013-2 of filing a brief be waived.

### CONCLUSION

**WHEREFORE,** the Debtors respectfully request that this Court grant the Motion by entering the Bidding Procedures Order and the Sale Order, and grant such other and further relief requested herein and/or as this Court deems just and proper.

                                            **TRENK, DiPASQUALE,**
                                            **DELLA FERA & SODONO, P.C.**
                                            *Counsel to Chapter 11 Debtors*
                                            *and Debtors-in-Possession*

Dated: July 2, 2015                      By:   /s/ Thomas M. Walsh
                                                      THOMAS M. WALSH

## VERIFICATION

**WINTHROP HAYES**, of full age, certifies as follows:

1. I am the President of the Debtors. As such, I have full knowledge of the facts set forth in, and am duly authorized to make this Verified Application.

2. I have read the foregoing Verified Application and certify that the statements contained therein are true based upon my personal knowledge, information and belief.

3. I am aware that if any of the factual statements contained in the Verified Application are willfully false, I am subject to punishment.

Dated: July 2, 2015          /s/ Winthrop Hayes
       WINTHROP HAYES

4832-8243-2036, v. 2